Davis, Judge,
delivered tbe opinion of the court:
This is a breach-of-contract suit charging defendant with unreasonable delay in supplying parts and drawings, and in failing to permit the prompt commercial purchase of parts when none were available in Government stores. Plaintiff is said to have suffered over $1,650,000 in damages because of defendant’s improper delay.[1]
In 1950, the Army prepared to let a contract for the rebuilding of some 50O' M36 90mm. motor gun carriages (tanks) which were believed needed to meet the emergency of the Korean hostilities. The vehicles were in a poor state, having been left in the open since World War II. Plaintiff had had some previous experience in rebuilding tanks and was one of five companies asked to submit bids. As plaintiff’s representative, Mr. Ambrose Cates (who had been in charge of the earlier “rebuild” operations) spent two weeks at Rock Island Arsenal, in Illinois, inspecting some of the M36 tanks located there, meeting with Army representatives, and familiarizing himself with the work in order to prepare a bid; the contract specifications were not yet completed. Agents of the other companies did the same. Four concerns submitted bids on November 30,1950, and plaintiff was found to be the low bidder. A pre-award survey was made, by Army officials acompanied by Cates, of the facilities at Cramp Shipyard (at Philadelphia) which plaintiff had an option to sublease and where it proposed to perform. The *533 report made to the Government confirmed the suitability of the premises for conducting the “rebuild” operation and plaintiff received a notice of award dated December 28,1950. The contract was not formally executed until sometime in March 1951.
Although the specifications had still not been fully readied at the time of the award, the notice directed plaintiff to proceed with the work “in order that the delivery schedule outlined in your proposal may be strictly maintained.” The contract called for the rebuilding of 581 M36 tanks to be delivered by the contractor to the Government in accordance with the following schedule:[2]
April 1951_ 75
May 1951_100
June 1951_100
July 1951_125
August 1951_125
September 1951_ 56
Among other things, the Government was to supply reconditioned engines and 90mm. guns for all of the tanks. In addition, at the contractor’s written request, the Government was to furnish, “to the extent available from its existing stores,” parts and materials “which have been declared unserviceable by the Contracting Officer or which after inspection were found to be missing from the vehicles.” If such replacement items could not be furnished, the contractor, when directed by the Contracting Officer in writing, was to manufacture or purchase the parts and would be reimbursed its actual costs in an aggregate not exceeding $500,000.[3] There was also the normal clause permitting extensions of time if the Government’s failure to supply parts and materials caused delay in the work.
At the outset of performance, in early January 1951, plaintiff had basically to start from scratch in organizing an operational physical plant and production line. It had a nucleus of only three men (management or administrative *534 personnel) in Philadelphia and had yet to hire a full complement of administrative and production employees. It also had to exercise its option on the Cramp Shipyard facilities and to prepare the premises for receiving and storing tanks, parts, and equipment.- All of this plaintiff says was accomplished in time to complete the rebuilding on schedule were it not for government-caused delays. Completion, originally set for September 1951, did not come until September 1952.[4] From December 28,1950 (notice of award) to December 15, 1951,[5] plaintiff finished the rebuilding of 261 tanks; then, because the Government could not for a time supply further engines and guns, the work was suspended until March 15, 1952; operations resumed thereafter and were continued in an orderly and prompt fashion. This history of performance is divided by the parties into three periods. The “first phase” was from January 1951 until suspension; then came the “suspension period” (from December 15, 1951, until March 15, 1952); finally, there was the “second phase” from March 15, 1952, until completion in September 1952. Plaintiff makes no claim for delay (or other damages) during the second phase (except that which may have been an after-effect of the three-month suspension from December 15,1961, to March 15, 1952). Defendant, on its part, does not contest liability for damages during the suspension period. The main battleground is the first phase, during which plaintiff claims, and defendant denies, that undue Government delay caused the considerable loss which the contractor incurred on this contract.
This claim has not been administratively considered on its merits. Although plaintiff did apply to the Contracting Officer for compensation, the claim was denied without any consideration on the ground that it was outside agency jurisdiction as a demand for unliquidated damages. Plaintiff’s petition was then filed in this court, the case tried, the Trial Commissioner’s findings reported, and the briefs and exceptions filed, without any objection by the defendant to the *535 trial and determination of the case in this court and without any suggestion of the need for administrative proceedings. After the filing of the Commissioner’s report and of all the exceptions and briefs, but 'before the oral argument, the defendant for the first time moved for a stay to permit the parties to have the issues determined administratively, citing United States v. Carlo Bianchi & Co., 373 U.S. 709 (1963). Plaintiff opposed the motion and it was denied (before argument) without prejudice. The point was again raised at the argument. We reject it. Whatever might have been the defendant’s right to seek administrative determination of the facts if the issue had been timely raised, we hold, as we have before, that in this case defendant waived any such right by making its first move too late. WPC Enterprises Inc. v. United States, 163 Ct. Cl. 1, 8, 323 F. 2d 874, 878 (1963); Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 805-7, 337 F. 2d 861, 862-63 (1963); Wingate Construction Co. v. United States, 164 Ct. Cl. 131, 139 (1964).
As the case comes to us, the overriding issue is whether defendant should be held responsible for expenses said to have been caused plaintiff by the alleged failure of the Government, during the first phase of performance (December 28, 1950-December 15, 1951), to be reasonably prompt in (i) furnishing parts available from Government stores, (ii) making known its inability to supply such parts so that plaintiff could procure them elsewhere, (iii) furnishing drawings necessary for such outside procurement of parts, and (iv) facilitating such outside procurement. It is settled, of course, that mere delay, per se, incident to the Government’s making work or material available to a contractor is not compensable, in a claim for breach of contract, without a specific warranty. E.g., United States v. Howard P. Foley Co., 329 U.S. 64 (1946); United States v. Rice, 317 U.S. 61 (1942); Gilbane Building Co. v. United States, 166 Ct. Cl. 347, 333 F. 2d 867 (1964); Barling v. United States, 126 Ct. Cl. 34, 111 F. Supp. 878 (1953); Otis Williams & Co. v. United States, 120 Ct. Cl. 249 (1951); Daum v. United States, 120 Ct. Cl. 192 (1951). Absent a warranty (and there is none in this case), the contractor’s *536 recourse for mere delay is to seek an extension of the time of his performance. See, e.g., United States v. Howard P. Foley Co., supra. But this general principle presupposes that the Government has met the ever-present obligation of any contracting party to carry out its bargain reasonably and in good faith. See, e.g., Walsh v. United States, 121 Ct. Cl. 546, 102 F. Supp. 589 (1952). Unless expressly negatived, that duty is read into all bargains. It would be intolerable if the Government could disregard that responsibility, or were free to stretch its tardiness for however long it fancied, without sterner control than the mere prolongation of the completion date of the contract. The rule is, rather, that, when the Government’s delay in furnishing work or material stems from its failure to do what it should under the particular contract, it will have to respond in damages for the resulting additional outlays which are proved to have been caused the contractor. E.g., Peter Kiewit Sons' Co. v. United States, 138 Ct. Cl. 668, 151 F. Supp. 726 (1957); Thompson v. United States, 130 Ct. Cl. 1, 124 F. Supp. 645 (1954); Chalender v. United States, 127 Ct. Cl. 557, 119 F. Supp. 186 (1954); Kehm Corp. v. United States, 119 Ct. Cl. 454, 93 F. Supp. 620 (1950); Laburnum Construction Corp. v. United States, 163 Ct. Cl. 339, 351, 325 F. 2d 451, 458 (1963). Under this principle, the plaintiff cannot prevail merely by proving that there was a lapse of time in receiving materials or even that the defendant was the source of that lapse. The lapse of time must be tied to the defendant’s breach of its obligation of reasonable cooperation. The nature and scope of that responsibility is to be gathered from the particular contract, its context, and its surrounding circumstances. Once a breach of this type has been established, the contractor must still show, as in all contract cases, that damage ensued. Cf. Litchfield Mfg. Corp v. United States, decided this day, post p. 604.
The net of our Trial Commissioner’s report is that plaintiff’s evidence has not met this standard. He has found, in effect, that the contractor has not borne its burden of proving that (a) the defendant delayed u/nduly with respect to the furnishing of parts from Army stores, (b) any delays of this *537 type interfered with plaintiff’s production, particularly in view of other concurrent causes of delay for which defendant was not responsible (plaintiff’s own production difficulties and inadequacies; delay by subcontractors; difficulties with plaintiff’s private landlord), and (c) the failure of defendant to supply drawings adversely affected plaintiff’s purchase of those parts not supplied by the Government. These are all factual questions which have been fully tried; the Commissioner’s adverse findings are therefore presumptively correct. Plaintiff has the twin task of affirmatively showing us that the Commissioner is wrong and that it has shouldered its own burden of proof as the suing contractor. “In this, as in all cases in which a Commissioner has carefully weighed conflicting evidence, the burden of sustaining exceptions to the findings is far from slight. We start with the double directive that due regard must be given to the Commissioner’s opportunity to judge the credibility of the witnesses and that his factual findings ‘will be presumed to be correct. Pule 48 [now Eule 66]. That presumption is dissipated only by a strong affirmative showing. Where, as often happens, what appears to be a sound objection to a finding is answered by an equally sound explanation in support of it, the presumption will carry the day. Where the specific testimony of witnesses, believed by the trier-of-fact, is countered only by the advocate’s theoretical arguments which may or may not be correct, we must ordinarily accept the trier’s evaluation. The same is true where the Commissioner has preferred one witness to an event (or set of witnesses) over another. Stronger assaults must be launched before the recommended findings can be overthrown. This is not to abdicate the court’s function as the ultimate finder of the facts. In a fallible and busy world, all that can be required for the due administration of justice and the foundation of a judgment is that, when the balance is close, we rely on the appraisal of an unprejudiced trier who has followed a process which will generally bring about a correct determination.” Davis v. United States, 164 Ct. Cl. 612, 616-17 (1964) (emphasis added).
A. Parts from Government Stores. — The contract did not spell out a schedule for the delivery of tank parts by the *538 defendant. These replacement items were to be provided as needed, but only to the extent available in Government stores. There was no guarantee or representation as to the number or type of parts which the Government would or could supply. The contractor first determined the items it wished to requisition; the contracting officer had to accept and countersign the requisition form; the papers were then forwarded to an Army depot to determine whether the requested items were available and where they were located. To the extent that the parts were available they were ordered, packaged, and shipped to plaintiff. To the extent the items were not available the plaintiff was informed that its request had been denied; only then was it free to obtain the part through purchase or manufacture.
Plaintiff’s claim, with respect to the government-furnished parts, is that there was undue and damaging delay both in delivering items that were eventually supplied by the Government and also in telling plaintiff when requested items were not available in Army stores. To sustain this aspect of its case plaintiff now relies largely on (a) alleged admissions by defendant’s officials that undue Government delay was hindering plaintiff’s performance; (b) a series of complaints by plaintiff, said to be to that effect; and (c) an accountants’ tabulation showing the number of days elapsing between the date of the contractor’s requisition and notification by the defendant that the request was denied (in whole or part), as well as the periods between requisition and receipt of parts from Government sources. In the light of the whole record, however, these pieces of evidence (and the others which plaintiff collects) do not move us to reject the Trial Commissioner’s conclusion that plaintiff has failed to show that any such delays were undue or caused damage. There undoubtedly were elapsed periods which now seem quite extended, but plaintiff has not proved that these delays breached the Government’s implicit obligations under the contract or that the delays actually hobbled performance.
1. Undue delay. It was inherent in the requisitioning system which plaintiff accepted (and which it knew before the formal execution of the contract in March 1951) that there were many possibilities of delay in the ordinary course of *539 events. There were several steps in the process, several Army installations had to be canvassed at one time or another, and several lists consulted. The defendant’s stores were not all centralized and easily available. Moreover, at two pre-award conferences plaintiff was informed by the commanding officer of Rock Island Arsenal that spare parts in Government stores were “not plentiful,” that they were “scarce,” due to the defense effort.[6] Because of this dearth of parts, it was agreed that plaintiff was not to order them all at once in maximum quantities. Plaintiff was thus forewarned at the outset of possible shortages, and also of possible delays in receiving parts (or notices that its requests would be denied). It had no right to anticipate as accurate and prompt service as might be expected under other conditions. The Government’s obligation is measured not by an ideal standard of promptness unrelated to the specific situation, but by the reasonable expectations of the parties in the special circumstances in which they contracted. Here, some delays should have been contemplated; the defendant would not default on its responsibility merely because the requisitioning process took longer than was initially hoped. Something more would have to be shown.
On this view, it is not significantly helpful to'plaintiff that the original schedule for the contract was changed, so as to prolong plaintiff’s time, because of delays in receiving parts (and drawings). In the circumstances, these extensions could well mean that the parties’ hopes had outrun reality, rather than that the defendant had acted improperly. Recognizing the delays as the cause of the extensions would free the plaintiff of the threat of liquidated damages, but it would not, in itself, prove that the delay was wrongful. Cf. Robert E. Lee & Co. v. United States, 164 a. Cl. 365, 368-10 (1964). The same is true of the “admissions” which plaintiff cites. The defendant’s officers 'conceded that there were shortages of parts and delays for which plaintiff was not responsible, but *540 they did not say that the Government had acted improperly or negligently. Their statements are all consistent with the implicit view that the delays were inherent in the process and in the circumstances — though in fact not foreseen hy the parties.
Plaintiff’s own written “complaints” during the first phase are hardly more persuasive as proof overturning the Commissioner’s findings. The major purpose seems to have been to obtain time-extensions and avoid liquidated damages. The statements about failure to obtain drawings are clearly directed at the defendant, but the references to parts are much more muted. Not until October 1951, toward the last of the first phase, do these documents really suggest that the defendant, rather than the situation, was at fault with respect to the parts. Until then, the responsibility appears largely centered, even in plaintiff’s eyes, in the inherent situation; for instance, in August 1951, a letter from plaintiff recognizes that “it takes considerable time before the Government is able to render a decision as to whether they can supply the parts as Government Free Issue under their depots or whether the contractor is authorized to purchase from the market under Part II of the contract.” The record does not convince us that even the plaintiff felt, prior to the latter part of the first phase, that though there was delay which could be shortened the defendant was breaching any obligation as to the parts.[7]
Plaintiff’s major assault on the Commissioner’s findings utilizes an accountants’ survey of the time which elapsed between the requisitions and either the delivery of the parts or the notice of unavailability. This tabulation shows that, for most of the filled requisitions, at least 30 days elapsed before delivery; on fewer occasions the time was 60 days or more; and for a substantial number the period was 90 days or more. As for the unfilled requests, although in the vast majority of instances notice was given in less than 30 days, there were *541 846 occasions on which 30 days or more elapsed; on 151 occasions this process took 60 days or more, and on 87 occasions 90 days or more. The Commissioner obviously gave little weight to this survey, and we do not feel justified in overruling him. The most telling defects are in the survey’s failure to link the delays (assuming that they were wrongful) to plaintiff’s performance (a subject we discuss immediately below), but we note also that the survey does not even compel the conclusion that the defendant took unreasonably long, in the circumstances, in filling or passing upon the requisitions. Defendant’s elaborate analysis in its brief (which we do not stop to summarize) points out various ways in which the survey falls short of proving that essential point. Though defendant’s analysis may not be wholly correct, we cannot say that the accountants’ tabulation has the impact plaintiff attributes to it. On the other hand, the record adequately supports the Commissioner’s affirmative finding that “extensive and continuous efforts were made by Government representatives to assist plaintiff in expediting procurement of parts from Government stores or in rapidly approving plaintiff’s requests to purchase parts from commercial sources or for deviations.” [8] The result is that we cannot say that plaintiff has borne its burden of proving that the Government delayed unduly with respect to the parts.
*542 2. G'amoÉion. Similarly, plaintiff has not persuaded us that the Commissioner was wrong in his alternative conclusion that any undue delays on defendant’s part (with respect to the parts) have not been shown to have interfered with production. Plaintiff must admit that, no matter how unreasonable the Government’s delay, there can be no recovery without proof that that delay caused material damage. Cf. Robert E. Lee & Co. v. United States, supra; Ralph Feffer & Sons v. United States, 166 Ct. Cl. 506, 514 (1964). In the evidentiary record made in this case there is much to support the Commissioner’s determination that such proof has not been made.
The primary lack is plaintiff’s complete failure to link its accountants’ general survey of the amounts of time taken by the Government (in the requisitioning process) with the course of the plaintiff’s operations. We are reminded in general terms that for want of a nail a kingdom could be lost, but there is no evidence or attempt to show, even by illustration, that the delay on this-or-that part held up work on so many tanks for such-and-such an approximate period. We are not told what inventories plaintiff had at various times, what parts it needed from time to time, or when it needed them. There is no effort to differentiate, even by general classes, between the reasonable and the unreasonable Government delays, and to show the special effect of the unreasonable delays. Other important causes of delay (such as dilatory subcontractors) are ignored. The whole subject is left to the general inference that long delays with respect to some parts must have caused damage. Without any specific proof, we are asked to assume that plaintiff’s serious production difficulties through part shortages were all due to undue Government delays — even though other substantial causes for these difficulties have been advanced, much of the defendant’s delay cannot on any view be deemed unreasonable, and there could not have been any injurious delay-effect with respect to the large nmnber of plaintiff’s requests (for *543 parts) which, were unnecessary.[9] Plaintiff has contented itself with broad generalities when specificity is essential.[10]
The case suffers from more than the absence of specific proof of causation. There is an affirmative showing that other causes, for which the defendant was not responsible, contributed most materially to the delay in production. Plaintiff has not separated these delays from that charged to the defendant, and, on this record, the Commissioner has been unable to do so. Since, as we will show, we cannot say that he was wrong, we must apply the rule that there can be no recovery where the defendant’s delay is concurrent or intertwined with other delays.[11]
Plaintiff’s own manufacturing problems engendered one main branch of this concurrent or inseparable delay. Plaintiff had to organize and equip an entire plant and production line, starting with three administrative employees. The building in which production was to be carried on was full of bags of grain and stores and many large items making up a disassembled steel mill. Although 70,000 square feet of the building were to be used for production, only 59,008 square feet were cleared by stages from January 1, 1951, to July 25, 1951. During January 1951 only 16,500 square feet were cleared and much of the space was *544 used for parts which were already arriving.[12] Plaintiff’s private landlord hindered it by withholding storage space which prevented the proper and orderly storing of government-furnished and commercially-obtained parts. The lack of adequate storage space had the adverse effects of hampering the formation of an efficient production line and a workable stock control system. The landlord did further damage to the orderly progress of the work by cutting off utilities and the use of cranes, and failing to make tools and equipment available throughout the nearly one-year period prior to suspension. There was also much to be desired of plaintiff’s personnel, as well as a continual turnover of the supervisory staff. In the first months of the contract plaintiff’s people, including its most valuable employee at the time, Mr. Cates (field manager), were partially involved in “performing or attempting to secure work outside the M36 rebuild.” Finding 30. The Trial Commissioner has also found that “from the outset plaintiff’s rebuild operation was characterized by lack of coordination and planning, which continued throughout the first phase of the work until the early months of 1952.” Finding-29. “The confusion and inefficiency which characterized the first phase of plaintiff’s operation was in large measure compounded by and due to inadequate, inexperienced personnel, particularly at the foreman, supervisory and executive level.” Finding 45.[13] For a significant *545 period, the contractor’s production department was apparently understaffed and under-equipped. In March 1951, there were only 57 linemen in that department. On June 20, 1951, a memorandum from the production superintendent to Mr. Cates showed that the problem still persisted:
Along with the complete costs, you requested we submit all complaints and hold-ups on the line, which is as as follows:
We are in need of approximately 125 men on the production line. We still need air tools, a 200 ton hydraulic press, and a couple lathes, welding machines, and one (1) more overhead crane.
I have no excuse for “no production”, and I submit no complaints about the other Department Heads, as you will probably receive plenty in the reports turned m from other people.
A second major branch of this concurrent and inseparable delay was due to the failure of plaintiff’s subcontractors to perform as expected or to make delivery until paid. Since a great portion of the necessary parts had to be obtained from subcontractors, this delay was at least as significant as that incurred on the government-furnished items. Failure to obtain a subcontractor-furnished part when needed would upset production just as much as the absence of an item from Army stores. This was made clear, at the time, by plaintiff’s agents who told the Army, repeatedly, that delays by subcontractors were seriously interfering with production. In this court plaintiff has not proved, or made an effort to prove specifically, that these undoubted subcontractor delays had little or no effect on performance. On the other side, while the record does not show precisely how or how much this trouble with subcontractors hampered production, the plain inference is that there was a substantial concurrent delay. This inference suffices, together with the proof of the other difficulties, to counterbalance the general inference of Government-caused delay drawn by plaintiff.
On this issue of the Government’s delay with respect to furnished parts, the heart of this case, as with some previous cases, is that, in effect, plaintiff “tell[s] us only the completion date as computed under the original contract, and the date of final acceptance. In this state of the evidence, we *546 cannot determine as a fact that the work was wrongfully delayed by the Government, and if we could so determine, we would still not have the remotest notion of how much it was so delayed.” George J. Grant Constr. Co. v. United States, supra, 124 Ct. Cl. at 205-06, 109 F. Supp. at 246.
b. Drawings and Private Procurement. — 1. From the beginning it was recognized that, for the private procurement ■of parts not supplied 'by the Government, the plaintiff might well need detailed drawings of the various items. At the pre-award conferences plaintiff was told that it would be given the drawings necessary for commercial procurement of parts peculiar to the M36 tank, but not the drawings for all of the ordinary hardware. It was later agreed that a list of drawings was to be supplied, out of which plaintiff was to choose only those actually needed for private procurement. There was some weeks’ delay in declassifying drawings. On March 19, 1951, 3,426 drawings were requested and between April 2 and May 9, 1951, 3,376 drawings were received (including some not requested). Plaintiff charges this as inordinate delay.
We agree that defendant should have acted with greater speed, but the real question is whether plaintiff was damaged. The Trial Commissioner has stated: “Although the plaintiff has demonstrated that it requested drawings of the defendant, there is no satisfactory evidence that the failure to furnish any particular drawing had any effect upon the performance of the contract work. The evidence is clear that the drawings were needed in the case where the plaintiff had to order a special part manufactured by a subcontractor. In no instance has the plaintiff shown that the ordering of any part was delayed due to lack of a drawing.” Finding 47. See, also, finding 69.[14] There is no reason why plaintiff, if it were unreasonably delayed in procurement, should not have informed the court which subcontracts or purchases had to be postponed because of the absence of particular drawings — or at least have offered typical examples. That is not an undue burden to put on a claimant; the circum *547 stances relating to a contractor’s letting of subcontracts are usually well known and most often documented.
In addition, there are the same defects as to proof of causation which we have found with respect to the government-furnished parts. There is no showing that failure to receive any privately-procured part — which had been delayed because of lack of drawings — held up work on any tank. On the other hand, there are the same concurrent delays which cannot be attributed to the defendant.
2. It is argued that the $500,000 limitation on reimbursement for purchase, manufacture, and extraordinary reclamation of parts le"d plaintiff to believe that all but $500,000 worth of parts would be available from Army stores and, accordingly, that when there had to be a greater degree of commercial procurement (evidenced by the fact that the figure was increased by $1,000,000) plaintiff was improperly delayed. We interpret this dollar limitation not as an implicit representation of the parts to be found in Government stores (which defendant, before the award, characterized as scarce), but rather as a tentative limitation designed to caution the contractor and protect the Government from having to pay for unnecessary purchases. Contrast Myers v. United States, 120 Ct. Cl. 126, 137 (1951), where the contract clearly and affirmatively stated that the Government had requisitioned a certain amount of lumber to be supplied to the contractor. The clause in the present case was a provisional ceiling designed to restrict costs, but subject to reappraisal. The Government had no accurate way of knowing what parts would be necessary, or what parts it would have on hand when requested. No mortality table had been made for the M36, and there was no good measure of the life of all its component parts. This the plaintiff knew. The contract itself explicitly stated that the Government would only furnish parts and materials “to the extent available from its existing stores.”
3. Plaintiff also claims it was delayed in commercial procurement by defendant’s requirement that three bids be obtained before subcontracting. Since it was the Government’s funds which were being used in procurement we think *548 this was a reasonable demand to safeguard the public. Competitive bidding is the- traditional means of doing so. The defendant had a right to require this for all purchases. The fact that plaintiff was later permitted to make small purchases of $250 without obtaining bids does not show that the three-bid requirement was unreasonable or that this new method of procurement for small purchases should have been allowed at an earlier time than was the case.
c. Owns and Engines. — Reconditioned engines and guns were to be supplied by defendant for all the vehicles. Sufficiently early, 581 engines were delivered to plaintiff; however, because of defendant’s overseas requirements 313 were repossessed by the Government, leaving the contractor with 268 for the first phase (the one-year span preceding suspension) with which we are now treating. Since there was an adequate number of engines to complete the 261 tanks which were rebuilt before suspension there is no ground for a claim of delay because of the absence of engines during that period.
The 90mm. guns were to be reconditioned by the Rock Island Arsenal and delivered to plaintiff in accordance with a schedule which defendant did not meet. As of August 13, 1951, plaintiff had received only 94 guns. On September 25, 1951, the contractor was advised to keep the rebuilding operation going even when the gun supply was exhausted, and that, if necessary, the tanks would be accepted without guns. Supplemental Agreement No. 2 reduced the contract price to account for elimination of the work of installing the guns; later, by Agreement No. 8, this amount was restored when, after the suspension period, guns became available and the installation was accomplished.
In a letter to the Army dated August 24, 1951 (plaintiff says one of several letters), plaintiff wrote that its inventory of guns would be entirely depleted by August 29, 1951. Although there is no such proof, we assume the latter date to be the actual point when the contractor was entirely without guns. Permission to proceed without the weapons did not come until September 25,1951. One claim is that this interim between exhaustion-of-supply and permission-to-continue *549 caused plaintiff damaging delay. There is, however, no evidence that work was curtailed during that period, or in what respects and to what extent. . Plaintiff has shown no particular 'additional costs nor how much they were, nor the period of alleged delay. Installation of guns was a separate aspect of the contract; other work could apparently proceed unhindered without the weapons. On this record we have no reason to believe that the 'absence of guns or the delay in permission hampered the rebuilding operation — especially in the light of the concurrent delays for which defendant is not liable.
For these reasons, we conclude that plaintiff has failed to show that the Trial Commissioner erred in his basic findings relating to the first phase of contract performance. Those findings must stand and they preclude recovery for delays during that time.[15]
There remains the matter of the suspension-period. The Government ordered a suspension of work after the completion of the 261st vehicle[16] because of the lack of guns and engines. Liability is admitted for the delay during this suspension and defendant agrees that the case should, on this point, be remanded to the Commissioner for a determination of damages. Although challenged by defendant, we adopt the Commissioner’s determination that the work stoppage extended from December 15, 1951 to March 15, 1952 (see footnote 5, supra). We also hold that the damages should cover all the extra costs attributable to or arising out of the suspension — not merely the extra costs incurred during the suspension — including, for example, the additional costs (if any) of stopping the work for this suspension and then re-starting it after three months. Plaintiff is entitled to recover the damage it suffered by reason of the suspension (with deductions for whatever productive work is found to *550 bave been performed during that period) as well as any additional costs following the suspension which would not have been incurred but for the work-stoppage.
Plaintiff is not entitled to recover on its claim pertaining to the first phase of the contract (from December 28, 1950, to December 15, 1951), and the petition is dismissed to the extent of that claim. On the remaining issue, judgment is entered for plaintiff and the case is referred to the Trial Commissioner for further proceedings, under Eule 47(c), consistent with this opinion.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of the State of New York.
2. On December 28, 1950, plaintiff and the Philadelphia Ordnance District, Department of the Army, entered into Contract Number DA-36-0’34-OED-75 for the rebuilding of 581 90 mm. motor gun carriages, M36, for a total contract price of $2,228,533.10. The contract provided in pertinent part as follows:
SCHEDULE
Article Al. /Scope of Contract

Part 1

remanufacture at fixed price
A. General. — The Contractor shall furnish all the necessary labor, material, tools, machinery and equipment, except as herein otherwise provided, and shall, under the supervision of the Contracting Officer or his nominee, complete the remanufacture and modification of a quantity of 581 Carriage Gun Motor 90MM M36, hereinafter referred to as “the vehicles”, to be furnished the Contractor as Government furnished property. All work shall be in accordance with Eock Island Arsenal Overhaul Guide and Specification for Carriage Motor 90MM M36, hereinafter referred to as specification, the context of which is incorporated herein and made a part hereof by reference.
*551 B. Vehicular Location and Transfer to Contractor's Plant.—
1. The vehicles to be remamifactured and modified are presently located at those Government installations set forth below, in the approximate quantities indicated:
471 Letterkenny Ordnance Depot
6 Lima Ordnance Depot
71 Anniston Ordnance Depot
S3 Bock Island Ordnance Depot
5ST Total
2. All. of the vehicles above mentioned, less 90MM Guns, will be delivered F.O.B. cars, Contractor’s plant.
C. Remanufacture and Modification of Vehicles.— The Contractor will disassemble and inspect each vehicle and will repair, remanufacture, modify, and rebuild all vehicles, parts, components, accessories and attachments declared serviceable by the Contracting Officer and will reassemble each of the said vehicles all to combat standards meeting as a minimum all requirements of Fifth Echelon Maintenance, all such work to be performed in accordance with the specification as hereinafter provided, except to the extent that such work is modified and qualified as hereinafter set forth:
1. Engines. — All completed vehicles will be powered by Ford GAA engines which will be supplied f .o.b. cars, Contractor’s plant, as Government furnished material, domestically packed in such an operable condition so as to be installed in the vehicles by the Contractor without further cleaning, rebuilding, or repair. All engines assembled to the vehicles, upon arrival at Contractor’s plant, shall be removed and stored by the Contractor. Shipping instructions will be supplied by the Contracting Officer.
2. On Vehicle Material: The Government will supply on vehicle materials to be shipped with reconditioned vehicles. Any loose materials received with the vehicles supplied by the Government, will be removed by the Contractor, stored and reported to the Contracting Officer for disposition. The Contractor shall complete any repairs, changes or modifications to the vehicles which are necessary to insure the future ready assembly on to or into the vehicle of a complete set of on vehicle material, as defined in the applicable drawings and specifications. In order that a proper determination can be effected with respect to this requirement, the Contractor will be entitled to receive two complete sets of on ve- *552 hide material to be used as gages. 90MM Guns will be reconditioned by the Government at Eock Island Arsenal and will be supplied to the Contractor as Government furnished material, f.o.b. cars, Contractor’s plant, in time to meet Contractor’s delivery schedule. Acceptance, disposal and reuse of radio and signal equipment will be under the direction of the Contracting Officer.
'3. Fire extinguishing tanks, fastened to the vehicle as a part of the permanent fire fighting equipment, are to be considered as OVM, and will be supplied by the Government to the Contractor reconditioned, recharged and ready to be installed in the vehicle. The Government will supply these fire extinguishing tanks from its own stock or may, at its option, direct the Contractor to have the tanks reconditioned, tested and recharged in accordance with the applicable specifications, by subcontract or otherwise. In this event, the Contractor will be reimbursed for such subcontracts, its actual cost as defined in Part II of this contract and payment made to the Contractor in accordance with Part II, Paragraph C(l) (a) except that the 3% overhead charged will not be paid by the Government.
4. Vehicles will be tested in accordance with the applicable specifications at the Contractor’s expense.
D. Assistance Rendered Contractor. — The Contracting Officer, to the extent he deems necessary, will provide the supervisory personnel to render decisions and necessary guides requisite to expeditious accomplishment of the work herein provided and inspection personnel to accept or reject material, to assist in the disposition of salvage and scrap, and determination of the acceptability of all work performed by the Contractor pursuant to this contract.
E. Government Furnished Parts and Materials. — The Government will supply to the Contractor as Government furnished property, f.o.b. cars, Contractor’s plant, Philadelphia, Pennsylvania, upon the Contractor’s written request, to the extent available from its existing stores, materials and supplies necessary for the performance of this contract, consisting of and limited to the following:
1. All vehicle parts, common or otherwise, including components, accessories and attachments, which have been declared unserviceable by the Contracting Officer or which after inspection were found to be missing from the vehicles.
2. All Anti-Freeze.
3. 90MM Guns reconditioned and ready to be installed by Contractor.
*553 4. On Vehicle Material.
It is understood and agreed that the Contracting Officer upon his determination that any of the parts set forth in sub-paragraph 1 above, common or otherwise, components or accessories and attachments are not available from Government sources for such supplies, may direct the Contractor to perform any of the services set forth in Part II of this Article 1.
F. Preparation for Shipment.—
1. All vehicles remanufactured and accepted hereunder will be prepared for domestic shipment.
2. All Government owned property determined by the Contracting Officer to be excess to the requirements of this contract, either during the performance thereof or upon completion or termination, which may be in the Contractor’s possession pursuant to this contract and not herein otherwise specifically provided for, will be prepared for shipment in accordance with accepted commercial practices and delivered to the Government f.o.b. cars, Contractor’s plant within sixty (60) days after notification of the Contracting Officer’s determination of excess in writing.
3. Gasoline, oil and anti-freeze removed from the vehicles will be stored by the Contractor and reported to the Contracting Officer for disposition.
G. Workmanship. — All work as contemplated in both Part I and Part II of this Article by the Contractor will be executed in the best and most workmanlike manner by qualified, careful and efficient workers, in conformity with the best standard practices.
H. Parts and Supplies. — The Contractor will furnish to the Contracting Officer, upon termination or completion of this contract, a complete mortality list of all parts and supplies used in the total rebuild operation (not necessarily itemized for each vehicle and excluding those items or materials generally attributed to the Contractor’s plant operation) by Government nomenclature, part number and prices (where prices are available). This list as qualified by the foregoing will include the following:
I. Parts and supplies furnished to the Contractor by the Government as Government furnished property.
2. Parts and supplies purchased, manufactured or otherwise acquired by the Contractor for the Government as provided in Part II of this Article Al.
I. F.O.B. Point and Loading. — All vehicles remanu-factured hereunder shall be delivered by the Contractor *554 to the Government f.o.b. Common Carrier at the railroad siding nearest the Contractor’s plant, and the same sbfi.11 be properly braced and blocked, in accordance with existing regulations, except that one of the first ten (10) completed and acceptable vehicles, as selected by the Contracting Officer, will be delivered by the Contractor f.o.b. cars, Contractor’s plant for shipment to Aberdeen Proving Ground, Aberdeen, Maryland. In like manner, similarly selected, one vehicle in each successive one hundred (100) vehicles remanufactured will be delivered to Aberdeen Proving Ground, Aberdeen, Maryland, f.o.b. cars, Contractor’s plant. Contractor will use same blocking and bracing material supplied by the Government on incoming shipments.
J. Delivery Schedule. — The Contractor will deliver to the Government remanufactured vehicles as herein provided in accordance with the following schedule. Any failure or delay in performance under this contract shall be considered as excusable delay when such failure or delay is occasioned by the Government’s failure to supply the requisite Government furnished property as herein provided.
April 1951_ 75
May 1951_100
June 1951_100
July 1951_125
August 1951_125
September 1951_ 56
K. Payment.—
1. Upon delivery and acceptance of the contract items and presentation of properly certified invoices, the Government will pay the Contractor Two Million, Two Hundred Twenty-eight Thousand, Five Hundred Thirty-three Hollars and Ten Cents ($2,228,533.10) as herein set forth and in accordance with the following schedule:

Part 1

Eemanufacture of Vehicles:
581 Vehicles @ $2,975.10_$1, 728, 533.10

Part %

Estimated total amount for reimbursement at cost plus 3% overhead for parts and materials for 581 vehicles_ $500, 000.00
Total Contract Amount. 2, 228, 533.10
*555 2. Until all Government property furnished to or acquired by the Contractor under this contract has been returned to the Government or has been satisfactorily accounted for in accordance with the applicable provisions of this contract by the Contractor, this contract will not be deemed fully performed by the Contractor.
3. The Contractor authorizes the Government to withhold Fifty Eight Thousand, One Hundred ($58,100.00) Dollars from final payment pending complete compliance with all terms of the contract.
4. Cost of preparing original engines for shipment, as outlined in paragraph Cl, Part I of this Article A-l, will be negotiated at a future date when the type of packing required and the destination of the engines has been determined.
L. Scrap. — Scrap resulting from Government-owned material furnished to the Contractor hereunder or procured by the Contractor and reimbursed by the Government under the provisions of Part II of this contract shall be properly segregated and reported to the Contracting Officer for disposition.

Part II

REIMBURSEMENT AT COST EOR PARTS, MATERIALS AND SERVICES
A. Parts and Supplies. — In connection with its work under this contract, the Contractor, when directed by the Contracting Officer in writing, shall acquire or manufacture for the Government’s account certain parts and materials as follows:
All vehicle parts, common or otherwise, including accessories, anti-freeze, components and attachments, which the Government is unable to furnish to the Contractor as herein elsewhere provided.
B. Services Incident to Extraordinary Reclamation.— In the event the Contracting Officer determines that any of the above mentioned vehicle parts, accessories, antifreeze, components or attachments, can, in the best interest of the Government, be more advantageously reclaimed by a process approved by the Contracting Officer then, and in such event, the Contracting Officer may direct the Contractor to so reclaim or have reclaimed such item or items. Costs incident to such reclamation to be reimbursable as follows:
1. Parts specified to be reclaimed by the Eock Island Arsenal Overhaul Guide and Specification for *556 Carriage Motor 90MM, M36, will be reclaimed by the Contractor without further reimbursement.
2. Minor reclamation of parts not specified in Bl above, will be accomplished without further reimbursement.
3. All other reclamation required to be accomplished by the Contracting Officer will be reimbursable at a price to be negotiated by the parties.
C. Upon inspection and acceptance by the Contracting Officer of the parts and materials acquired or manufactured, as set forth in Paragraph A above, or upon, the completion and acceptance of the reclamation services, as set forth in Paragraph B above, and upon the Contractor’s furnishing satisfactory evidence that it has made payment or incurred costs as the case may be, the Government shall reimburse the Contractor for the actual costs of (i) parts and materials acquired or manufactured; (ii) services in connection with the reclamation of parts as set forth in paragraph B above, provided that such actual costs do not exceed in the aggregate the sum of Five Hundred Thousand ($500,000.00) Dollars. The term actual costs as used herein means as follows:
1. For parts, materials and services procured by the Contractor from sources other than its own manufacture.
a. The net invoice price to it of the said parts, materials and services plus 3% overhead, Contractor representing, based on experience, that the 3% charge does not include any element of profit and represents no more than actual cost allocable to acquisition.
b. The cost of transportation provided that no costs of transportation shall be separately reimbursed when the invoice price reimbursed under 1(a) hereof includes the cost of transportation.
2. For parts and materials manufactured or furnished by the Contractor.
a. The net invoice price to it of all material required.
b. The cost of transportation provided that no cost of transportation shall be separatedly [sic] reimbursed when the invoice price reimbursed under 2(a) hereof includes the cost of transportation.
c. The cost to it of all direct labor required in manufacture.
d. An amount equal to 122% of item 2(c) hereof as an allowance for all overhead and administrative expenses. The Contractor represents, based on experience, that this amount does not include any element of profit, and represents no more than actual costs allocable to manufacture.
*557 D. In the event the Contracting Officer shall determine, at any time prior to the manufacture or procurement of any item or parts or materials or performance of service as set forth above, that such item or service is not reasonably necessary for the performance of this contract he may by written order exercise one of the following options with respect to that item or service,
1. If the Contractor has made no binding commitment and incurred no expenses therefor of a kind reimbursable hereunder as an actual cost, the Contracting Officer may eliminate the item or service as recited above and the Government shall be relieved of any liability therefor.
2. If the Contractor has made a binding commitment or incurred expenses therefor of a kind reimbursable hereunder as an actual cost; the Contracting Officer may direct the Contractor to stop all further work and the making of any further commitments thereof and eliminate the item or service as recited above. In that ■event, the Contractor and the Contracting Officer will agree on an amount which will reasonably compensate the Contractor for the actual cost incurred by him with regard to such eliminated item or service. If no such agreement is reached within thirty (80) days after the date of elimination (or within such longer period as may be at any time mutually agreed upon) the Contractor will be paid an amount, if any, which together with all sums previously paid by the Government on account of the item or service shall be sufficient to reimburse the Contractor for expenses paid, and the settlement of any obligations incurred by the Contractor thereof. In lieu of reimbursing the Contractor for the settlement of obligations, the Government, at the discretion of the Contracting Officer, may assume such obligation on any of them. In no event shall the aggregate of their reimbursement on account of the item or service (and of all payment previously made) together with the amount of any obligation assumed exceed the actual costs as herein defined, expended or incurred thereof up to the time of such elimination. The Contracting Officer may permit the Contractor to sell or retain, at prices or terms agreed to by the Government, any materials, supplies or work in process and the proceeds of such sale or such agreed price shall be paid or credited to the Government in such manner as the Contracting Officer may direct. Upon payment to the Contractor, pursuant [sic] to subparagraph 2 of paragraph B above, title to all materials, supplies, work in *558 process and other things for which payment is made (except such property as may be sold or retained as above provided) will vest in the Government (if title thereto is not vested in the Government). The Government will also become entitled to any rights under any commitment which it may assume or for the settlement of which it shall reimburse the Contractor.
E. Except with the prior written approval of the Contracting Officer for each such purchase, the Contractor will not purchase any of the above recited parts,, materials or services in which it had any property interest at any time, after the commencement of negotiations for this contract. However, when directed by the' Contracting Officer, in writing, Contractor may supply parts, materials or services from its own stock, to the Government, for use in the performance of this contract,, at a price to be mutually agreed upon. Such parts, materials or services to be reimbursable in accordance with Paragraph C (1) (a) above, except that the 3% overhead charge will not be paid by the Government.
F. Title to each item of parts and materials as above recited shall vest in the Government immediately upon inspection and acceptance thereof by the Contracting-Officer or at such earlier date as the Contracting Officer-may designate in writing. The Contractor’s responsibility in connection with the care, custody, storage and use of any and all parts and materials acquired or-manufactured for the Government’s account as recited, above, shall be as herein elsewhere provided in this, contract.
G. The Government reserves the right to furnish to the Contractor f.o.b. the Contractor’s plant any or-all of the parts and materials as recited above upon written notice to that effect from the Contracting Officer-to the Contractor, delivered at any time prior to the procurement or manufacture of such items.
H. The reimbursement due the Contractor for its costs-incurred in the performance of this Part 2 of this contract, subject to the limitation in paragraph D thereof, shall be computed in accordance with the cost principals set forth in Part 2 of Section XY of the Armed Services. Procurement Regulations, which part is incorporated, herein and made a part of this contract by reference in. accordance with Paragraph 15-102 of said Armed Services Procurement Regulations.
I. Examination and Audit of Contractor's Costs: The Contracting Officer or his duly authorized representative-. *559 shall, at all reasonable times, have the right to examine, audit, or otherwise satisfy himself as to the correctness of the purchase records, invoices, or original time records upon which the Contractor’s claims for payment are based for the parts, materials and services reimbursable under this Part II of this contract. The Contractor’s time records, purchase records and invoices shall be preserved by him, subject to further Government audit, for a period of three (3) years after the date of the completion or termination of this contract, and the Contractor undertakes to maintain his books and records in a manner satisfactory to the Contracting Officer.
GENERAL PROVISIONS
(Supply Contract)
1. Definitions
As used throughout this contract, the following terms shall have the meanings set forth below:
(a) The term “Secretary” means the Secretary, the Under Secretary, or any Assistant Secretary of the Department, and the head or any assistant head of the executive agency; and the term “his duly authorized representative” means any person or persons or board (other than the Contracting Officer) authorized to act for the Secretary.
(&) The term “Contracting Officer” means the person executing this contract on behalf of the Government, and any other officer or civilian employee who is a properly designated Contracting Officer; and the term includes, except as otherwise provided in this contract, the authorized representative of a Contracting Officer acting within the limits of his authority.
(e) Except as otherwise provided in this contract, the term “subcontracts” includes purchase orders under this contract.
2. Changes
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required *560 for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 80 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
3. Extras
Except as otherwise provided in this contract, no payment for extras shall be made unless such extras and the price therefor have been authorized in writing by the Contracting Officer.
* % * * *
5. Inspection
(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance.
(&) In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, the Government shall have the right either to reject them (with or without instructions as to their disposition) or to require their correction. Supplies or lots of supplies which have been rejected or required to be corrected shall be removed or corrected in place, as requested by the Contracting Officer, by and at the expense of the Contractor promptly after notice, and shall not again be tendered for acceptance unless the former tender and either the rejection or requirement of correction is disclosed. If the Contractor fails promptly to remove such supplies or lots of supplies, when requested by the Contracting Officer, and to proceed promptly with the replacement or correction thereof, the Government either (i) may by contract or otherwise replace or correct such *561 supplies and charge to the Contractor the cost occasioned the Government thereby, or (ii) may terminate this contract for default as provided in the clause of this contract entitled “Default.” Unless the Contractor elects to correct or replace the supplies which the Government has a right to reject and is able to make such correction or replacement within the required delivery schedule, the Contracting Officer may require the delivery of suck supplies at a reduction in price which is equitable under the circumstances. Failure to agree to such reduction of price shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.”
(c) If any inspection or test is made by the Government on the premises of the Contractor or a subcontractor, the Contractor without additional charge shall provide all reasonable facilities and assistance for the safety and convenience of the Government inspectors in the performance of their duties. If Government inspection or test is made at a point other than the premises of the Contractor or a subcontractor, it shall be at the expense of the Government: Provided, That in case of rejection the Government shall not be liable for any reduction in value of samples used in connection with such inspection or test. All inspections and tests by the Government shall be performed in such a manner as not to unduly delay the work. The Government reserves the right to charge to the Contractor any additional cost of Government inspection and test when supplies are not ready at the time such inspection and test is requested by the Contractor. Final acceptance or rejection of the supplies shall be made as promptly as practicable after delivery, except as otherwise provided in this contract; but failure to inspect and accept or reject supplies shall neither relieve the Contractor from responsibility for such supplies as are not in accordance with the contract requirements nor impose liability on the Government therefor.
(d) The inspection and test by the Government of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be discovered prior to final acceptance. Except as otherwise provided in this contract, final acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.
(e) The Contractor shall provide and maintain an inspection system acceptable to the Government covering *562 the supplies hereunder. Records of all inspection work by the Contractor shall be kept complete and available to the Government during the performance of this contract and for such longer period as may be specified elsewhere in this contract.
*****
11. Default
(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:
(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or
(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
(b) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.
*****
12. Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce Ms decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Of *563 ficer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
Article 21 Partial Payments. Partial payments, which are hereby defined as payments prior to delivery, on work in progress for the Government under this contract, may be made upon the following terms and conditions.
(a) The Contracting Officer may, from time to time authorize partial payments to the Contractor upon property acquired or produced by it for the performance of this contract: Provided, that such partial payments shall not exceed 75 percent of the cost to the Contractor of the property upon which payment is made, which cost shall be determined from evidence submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer; Provided further, that in no event shall the total of -unliquidated partial payments (see (b) below) and of unliquidated advance payments, if any, made under this contract, exceed 80 percent of the total contract price of supplies still to be delivered.
(b) Upon the making of any partial payment under this contract, title to fill parts, materials, inventories, work in process-and non-durable tools theretofore acquired or produced by the Contractor for the performance of this contract, and properly chargeable thereto under sound accounting practice, shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor for the performance of this contract and properly chargeable thereto as aforesaid shall vest in the Government forthwith upon said acquisition or production; Provided, that nothing herein shall deprive the Contractor of any further partial or final payments due or to become due hereunder; or relieve the Contractor or the Government of any of their respective rights or obligations under this contract.
*564 (c) In. making payment for the supplies furnished hereunder, there shall be deducted from the contract price therefor a proportionate amount of the partial payments theretofore made to the Contractor, under the authority herein contained.
i\t % % * %
Article 24 Notice to the Government of Labor Disputes.
Whenever the Contractor has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this contract, the Contractor shall immediately give notice thereof, including all relevant information with respect thereto, to the Contracting Officer.
sji # * * $
Article 29 Liability for Government-Furnished, Property.
(a) Except as otherwise specifically provided, the contractor shall not be liable for loss or destruction of or damage to property of the Government in the possession or control of the contractor in connection with this contract (hereinafter called “Government property”) (1) caused by any peril while the property is in transit off the contractor’s premises, or (2) caused by any of the following perils while the property is on the contractor’s or subcontractor’s or other premises or by removal therefrom because of any of the following perils:
Fire; lightning; windstorm, cyclone, tornado, hail; explosion, riot, riot attending a strike, civil commotion, vandalism and malicious mischiefs; aircraft or objects falling therefrom; vehicles rumiing on land or tracks, excluding vehicles owned or operated by the contractor or any agent or employee of the contractor; smoke; sprinkler leakage, earthquake or volcanic eruption; flood, meaning thereby rising of rivers or streams, enemy attack or any action taken by the military, naval or air forces of the United States in resisting enemy attack.
The perils as set forth in (1) and (2) above are hereinafter called “excepted perils”.
if: i}: sfj j}:
(c) Upon the happening of loss or destruction of or damage to Government property caused by an excepted peril, the contractor shall communicate with the con *565 tracting officer and with the Loss and Salvage Organization now or hereafter designated by the contracting officer and, with the assistance of that organization employed by the contractor to perform services in accordance with instructions or regulations of the Government (unless the contracting officer directs that no such organization be employed), shall take all reasonable steps to protect the Government property from further damage, separate the damaged and undamaged Government property, put all the Government property in the best possible order, and furnish to the contracting officer a statement of: (1) the lost, destroyed and damaged Government property, (2) the time and origin, of the loss, destruction or damage, (3) all known interests in commingled property of which the Government property is a part, and (4) the insurance, if any, covering any part of or interest in such commingled property. If and as directed by the contracting officer, the contractor shall make repairs and renovations of the damaged Government property. The contractor shall be reimbursed the expenditures made by it in performing its obligations under this paragraph (c) (including charges made to the contractor by the Loss and Salvage Organization, except any of such charges the payment of which the Government has at its option, assumed direct), as approved by the contracting officer and set forth in a Supplemental Agreement.
❖ $ ‡ $
(e) Except to the extent of any loss or destruction of or damage to Government propery for which the Contractor is relieved of liability under the foregoing provisions of this article, and except for reasonable wear and tear or depreciation, or the utilization of the Government property in accordance with the provisions of this contract, the Government property (other than property permitted to be sold) shall be returned to the Government in as good condition as when received by the contractor in connection with this contract. In aid of its obligation so to return the Government property, the contractor shall maintain a property control, accounting and maintenance system consistent with good business practice.
# $ $ ‡ ‡
(g) The Government shall at all times have access to the premises wherein any Government property is located.
*566 Article 30 Special Tooling.
(a) It is agreed that the price or prices set forth in this contract take into account the cost to the contractor of jigs, dies, fixtures, molds, templates, patterns, special taps, special gauges, special test equipment, and other special tooling which the contractor must purchase or manufacture solely for use in the performance of this contract, herein collectively called special tooling. All special tooling as herein defined shall be governed by the provisions of this clause, and, subject to the provisions of paragraphs (c) and (d) of this clause, shall be used solely in the performance of this contract The term “Special Tooling” as used in this clause shall not include any items of tooling heretofore acquired by the contractor, whether or not altered or adapted for use in the performance of this contract.
(b) Unless otherwise provided in this contract, the contractor shall (i) identify by appropriate stamp, tag or other make all special tooling which is subject to the provisions of this section; (ii) maintain adequate property control records, including an inventory stock card covering all special tooling, until such time as the contractor has finally accounted for all such special tooling; (iii) and make available such records for inspection by the Government at reasonable times; and (iv) furnish to the Contracting Officer complete lists of the special tooling purchased or manufactured by the Contractor.
& ‡ ‡ ‡ $
(f) Any disagreement (other than a disagreement as to fair value for purposes of paragraph (c) of this clause) between the Contractor and the Contracting Officer, relating to any matter under this section shall be deemed to constitute a dispute concerning a question of fact and shall be resolved by the decision of the Contracting Officer, subject to final determination in accordance with the clause of this contract entitled ‘Disputes’.
❖ * # # jfc
Article 31 Records of Government-Furnished Property.
The Property Officer, Philadelphia Ordnance District, is designated as the officer to maintain the necessary property records in connection with this contract.
3. Subsequently, amendments to the contract were made by Supplemental Agreements numbered 1 through 12. The *567 date, purpose and effect on tlie contract price of each of these amendments are summarized below:
No. 1. August 13,1951. — The purpose of this amendment was to provide for the contractor to test and repair 300 Government-furnished Ford GAA engines at $42.27 apiece; to require the contractor to prepare the vehicles for export shipment, instead of domestic shipment; to increase the contract price on account of the cost of preparing for shipment to Government installations the engines which had been removed from tanks to be rebuilt ; to establish and increase the amount to be allowed the contractor for procurement or manufacture of parts and materials from $500,000 to $1,500,000; and to insert the provision for negotiated reimbursement for extraordinary reclamation of parts in Part I of the contract after deleting it from Part II of the contract. Supplemental Agreement No. 1 increased the contract price to $3,401,413.23.
No. 2. _ February 8,1952. — This Supplemental Agreement which was entered into after a suspension of work “due to the unavailability of guns and engines” provided for the rebuild of the vehicles without guns and breech block assemblies at a unit price reduction of $71.48; directed the contractor to test such vehicles by the addition of temporary ballast blocks during the tests at an increase in the total contract price of $5,195.40; and provided that such vehicles without guns and breech block assemblies should be packaged and stored as Government-owned property for which contractor undertook to supply storage space at an increase in contract price of $37,080, lighting of storage area and adequate security forces at increases in the total contract price of $10,382.40 and $30,660, respectively. In addition plaintiff agreed to furnish lifting services for 500 vehicles for a contract price increase of $11,587.50. Plaintiff further agreed, notwithstanding the suspension of rebuild operations upon completion of the 261st vehicle, to perform certain specified work on remaining 320 vehicles, namely, the removal and repair of Condition 7 GAA Ford engines at total contract increase of $33,092.80. The total effect on the contract price of Supplemental Agreement No. 2 was to increase the contract price to a total amount, for both Parts I and II, of $3,489,407.37.
No. 3. March 14, 1952. — This Supplemental Agreement provided for reimbursement for extraordinary reclamation of spare parts and cannibalization of such *568 parts from M4 A1 tanks which were identical to the M36 motor gun carriage except in armament and caliber of weapon. This work was to be done on a cost-plus-fixed-fee basis. The total contract price remained the same, but the. amount to be incurred under Part II was reapportioned.
No. Ip. June 9, 195%. — This agreement was accomplished in the form of a Change Order. It provided for additional sealing of Condition 7 engines to be removed from 320 vehicles. It increased the contract price to $3,563,626.23.
No. 5. Jime 18,195%. — By this Supplemental Agreement the total number of vehicles included in the contract was increased by 20, bringing the number to 601. The total contract price was increased to $3,628,042.83.
No. 6. August %9,195%. — The contract was amended by Supplemental Agreement No. 6 to list a quantity of tools to be furnished by the Government to the contractor, the tools on Part A to be returned to the Government; those in Part B to become the plaintiff’s property and the contract price was to be reduced by $1,022.08. The Agreement further provided that the Government would provide plaintiff with a gymnasti-cator at a contract price reduction of $802.64 which included packing, handling, transportation costs and use of the machine.
No. 7. December 18,195%. — This Supplemental Agreement provided for payment of $152,727.90 for additions or changes in export packaging requirements. It recited a complete release of all claims for additions or changes in export packaging requirements. The total contract price was increased to $3,778,946.01.
No. 8. Jume %3, 1953. — This Supplemental Agreement increased the unit price per vehicle by $71.48, previously reduced because of the lack of gun and breech block assemblies. The contractor subsequently was furnished 262 guns and breech block assemblies which resulted in the restoration of the price. The agreement also provided that plaintiff was to be compensated at the rate of $22.77 each for 179 vehicles shipped without guns and breech block assemblies. The total contract price was increased to $3,801,749.60.
No. 9. August 1,1953. — By this Supplemental Agreement plaintiff was reimbursed for removing 59 vehicles from storage at the direction of the Government, and unpacking them to install guns and then repacking them. The unit price was $265.35 for each of the 59 vehicles, increasing the total contract price to $3,817,405.25.
*569 No. 10. August 20,1953. — This Supplemental Agreement reflected renegotiation of the price allowed under Supplemental Agreement No. 2 for the leasing by plaintiff of an outside storage area. The contract price was reduced by $18,702.60 to $8,798,702.65.
No. 11. December 9,1953. — By this Agreement, Supplemental Agreement No. 2 was amended to reflect actual costs incurred in the removal of engines from incom-pleted vehicles. The total contract price was reduced by $6,280.43 to $3,792,422.22.
No. 1%. Jime 16, 1954■■ — This final Supplemental Agreement reflected the negotiated settlement figure of $513,008.75 paid to the contractor for all extra work and extraordinary reclamation required under the contract. The Agreement set forth a complete release of all claims against the United States for such extra work and extraordinary reclamation. This Agreement increased the total price of Part I of the contract from $2,227,551.25 to $2,740,560.
4. The written contract, although dated December 28,1950, was signed sometime in March 1951.
5. On January 2, 1951, S. G. Fassoulis, Franz Lissauer, and Everett B. Michaels entered into an Agreement which is in evidence as plaintiff’s exhibit No. 299 and is incorporated herein by reference. By the terms of this Agreement, the parties established a joint venture to perform the contract in suit and “to assume the obligations of Commerce [plaintiff company] thereunder and to receive all benefits therefrom * *
6. By three separate writings dated January 31, 1951, the plaintiff company, Associated Metals & Minerals Corporation of New York, and Hyman-Michaels Company of Chicago each agreed that the individuals referred to in finding 5 were acting on behalf of and for the account of such firms and the firms agreed to indemnify and save harmless such individuals from any and all liability or risk arising out of or in connection with the operations of the joint venture.
7. Under the joint venture, profits were to be distributed or losses were to be borne in the following proportions:

Percent

Fassoulis — acting for plaintiff_50
Michaels — acting for Hyman-Michaels_25
Lissauer — acting for Associated Metals_25
*570 At the conclusion of performance of the contract work, the plaintiff had suffered substantial losses. Under the joint venture, the other two companies referred to in the preceding finding agreed to and did pay to the plaintiff one-half the amount of such losses.
8. The plaintiff sent the following letter to the contracting officer on March 1,1951:
This is to inform you officially that C.A.M. Industries has been registered with the Secretary of the Commonwealth of Pennsylvania to do business in the State of Pennsylvania. C.A.M. Industries is a venture which has been set up for administrative convenience by Commerce International Company, Inc. to perform our rebuild contract with the U.S. Army.
C.A.M. Industries is guaranteed by Commerce International Company, Inc., and in all contractual matters in respect to our contract No. DA-36-084 — OKD-75, Commerce International Company, Inc. will be the contractual party.
Very truly yours,
COMMERCE INTERNATIONAL COMPANY, INC.
A. E. Cates, Jr.
9. The plaintiff company, prior to the award of and during the performance of the work under the contract in suit, was engaged in world trade; it was in the bartering business, dealing in equipment and manufactures. It had had some experience in the rebuilding of tanks in Hawaii and Formosa. Mr. Ambrose Cates was in charge of the rebuild work for plaintiff in both places,, assisted by Mr. Herbert Coleman and a Mr. Danuser. Plaintiff’s other employees on the work in China were native labor. Cates had been on active duty with the Navy during World War II. He was first employed by the plaintiff in late 1947.
10. Mr. Cates returned to the States in September or October 1950 for a vacation, and upon its conclusion was assigned the task of representing the plaintiff in negotiations with representatives of the defendant, ultimately resulting in the contract in suit.
*571 11. On approximately November 10, 1950, five companies, including the plaintiff, had been invited by the commanding officer of the Eock Island Arsenal, Eock Island, Illinois, to attend a conference relative to the defendant’s urgent need, due to the Korean action, for the rebuilding of 581 motor gun carriages, with a 90-millimeter gun and designated M36.
12. Mr. Cates spent about two weeks at Eock Island looking over some of the vehicles which were to be rebuilt, conferring with officials at the Tank Automotive Center there and generally becoming familiar with the work which was to be accomplished since the specifications for the work were not then completed.
13. By letter dated November 21, 1950, plaintiff, by its president, S. G. Fassoulis, submitted the following quotation and work plan for the rebuild of a minimum of 500 M36, 90 mm. motor gun carriages:
November 21, 1950.
Commanding Officer,
Eock Island Arsenal,
Eock Island, Illinois.
Dear Sir:
With reference to the rebuild of approximately 500 imits of M36 Motor Carriages, we hereby submit our quotation.
The work is to be carried out in accordance with your instructions and the Government standard requirement at our shops in Philadelphia or such other place as may be agreed.
In order to avoid complicated costing procedure relative to such work, we analyze and charge costs on the following basis:
I. Labor. — Productive and non-productive labor will be charged at the set figure of $3.00 per hour, eight hours per day and twenty working days per month. A six month time period thus provides 120 working days. Calculating a requirement of 960 man hours to complete each tank, a total of 460,800 straight working hours are required. Based on the above, total direct labor charge per tank_$2764. 80
Note (1) : The above covers shop overhead, fitters, mechanics, electricians, machinists, welders, watchmen, overtime wages, superintendence, draftsmen, technicians, storemen, clerical, telephone, administration and miscellaneous expenses.
*572 Note (2) : follows: The calculated breakdown per tank in hours is as

Sours

Engine rebuild_190
Complete electrical rebuild_170
Welding_ 60
Gun mount & cradle rebuild_ 60
Bogie wheel & track rebuild, including bearings_ 60
Transmission_ 20
Steam cleaning_ 10
Painting_ 10
Sand Blasting_ 10
Hull work, frame_120
Turret work, including dis-assembly_120
Miscellaneous _130
Total _„_960
II.Road Testing.—
A. Based on a 35 mile road test, including the loading, unloading and hauling to and from test area, per tank $20. 50
B. Labor required, per tank_ $14. 00
C. Gas, oil and grease, per tank_ $83. 00
Note (1) : Approximately 50 gallons of Ethyl gasoline will be consumed per tank; 68 quarts of highest grade number 10 or number 20 oil will be required for the cooling system, 32 quarts in the crank case, 172 quarts in the transmission, final drive and differential, totalling 272 quarts per tank.
Note (2) : After testing the oil will be drained and preventative oil will be replaced by this company.
III. Equipment.—
A. Small tools to be purchased, per tank_ $45.00
B. Heavy tools and equipment purchases and depreciation on equipment presently in this company’s stock, per tank_ $210.00
IV. Area. — Machine shops, storage area, cranes, platform sidings, etc., charged at $3,166.66 per month ($19,000.00 for a six month period), per tank_ $38. 00
V. Overhead Charges. — Accounting, executive and miscellaneous administrative, per tank_ $90. 00
VI. Processing for Overseas Shipment. — Assuming that the aluminum foil and mastic method is used, total of seven man hours are required at a cost per tank- $8.75
VII. Parts Required. — All parts are to be supplied by the Government. All items not supplied by the Government and directed by the Government to be supplied by this company will be charged to the Government at cost plus 3%.
Note: Commerce International has available for this project quantities of G104 and G210 series spare parts in stock. These parts are presently being catalogued and can be readily shipped to our shops in Philadelphia if required.
VIII. Profit — Estimated profit to Commerce International, per tank_ $100. 00
Based on the above calculations, we hereby agree firm to rebuild the tanks at a cost per tank of_$3374. 05
*573 This offer is made with the understanding that the contract will cover a minimum quantity of 500 units.
We wish to point out that our installation has dock facilities and the tanks shipped to our shops will not require any further inland freight. Fifty ton cranes are located at the docks, which provide excellent loading facilities.
We will be pleased to furnish any further information that you may require in this matter.
Yours very truly,
Commerce International Company Inc.
(s) S. G. Fassoulis, sgf/m S. G. Fassoulis.
November 22, 1950.
Schedule “A”
To: The Commanding Officer,
Nock Island Arsenal,
Nock Island, Ill.
From: Commerce International Co., Inc., 19 Eector St.,
New York, N.Y.
Subject: Nehabilitation progress work plan for approximately 500 motor carriages, M36.
All engines will be removed regardless of its presumable condition. The engines are pulled down, all parts and blocks inspected and miked, and replacement made as necessary. Valve jobs will be done whether or not. bearing, rings, or pistons are replaced. Valve springs will be checked, rod alignment checked, crank trueness checked, valve stem straightness checked, cylinder taper and eccentricity miked, etc. All accessories will be dismounted, put through an overhaul process, reassembled, painted, and tested, generators cleaned and overhauled for output, starters torqued and overhauled, fuel pumps overhauled and tested for vacumn and pressure, distributors for cam-angle and advance, coils and magnetos for voltage, new condensors and spark plugs installed, carburetors refitted and tested. Blocks will be steam cleaned and painted, engines reassembled and horsepower checked on a dynamometer after a suitable running period.
Electricians will remove all electrical components including cables and auxiliary generators, for testing, cleaning, and overhaul.
Turrets will be removed and ring replaced, or if none are available, ring dents are filled with weld and ground *574 to a plane surface. Turrets crews will overhaul all turret controls, overhaul the breech, recoils, sleighs, hydraulic motors, gyro-stabilizers, turret latch and ring, bow gun ballmount, etc., and then grease protect the parts. They will also overhaul the manual traverse system, turret bearings and rings.
When the motor carriage is stripped to a bare frame, it will be sand blasted and steam cleaned, preventative rust paint will be applied upon army specifications. The transmission, controlled differentials, final drive housings sprockets, volute suspensions and bogie wheels will be stripped from the tank and completely, overhauled. The track will be replaced and inspected with army inspectors.
“On Vehicle Maintenance” equipment will be taken from the vehicle when available and completely overhauled.
The electricians will reinstall the electrical units and test the circuits, radiators, gas tanks, and oil coolers will be flushed out, cleaned, and tested for leaks under air pressure, and fins straightened. Engines will be reinstalled, radiators remounted, wiring hooked up, battery installed and all circuits energized and operated.
A lubrication crew will lubricate the chassis and change transmission, differential, and final drive lubricants, while recoil, gyro, and traversing pump oils will be changed by the turret crew.
A pre-test run inspection will be made, engine compartment roof installed and vehicle is test run. A post-test run inspection is then made, corrections done, the vehicle retested if necessary and then turned over to a second party for their inspection and testing. On being approved, final outfitting will be done as required, such as periscopes, telescopes, pioneer tools, special tools, first echelon tools, gun kits, oil and water cans, fire extinguishers, tarpaulins, or OVM in cases. If radios are required, this will be installed. Serial numbers and other identifying marks will be stenciled on as required.
Accurate accounts of the entire job will be kept in accordance wtih army requirements. All personnel will use individual daily job time-cards and time breakdowns would be kept of the following labor categories: Supervisory, productive, and non-productive. All requirements of law for the contractors to government agencies would be rigidly adhered to.
As soon as complete overhaul specifications are available to the contractor, revised work will be performed by the contractor upon mutual agreement between the gov- *575 eminent and the contractor. It is understood that a qualified ordnance inspector will be assigned as inspector and all progress reports and results will be clarified and ■adhered to by both parties.
(s) S. G. Fassoulis,
S. G. Fassoulis.
14.Bids were received on November 30, 1950, from four firms as follows:

Firm Unit coat Total coat

Commerce International. $3,441.53 $1,999,528. 93
Bowen and McLaughlin.. 4,317. 27 2, 508,333.87
Walsh Construction_ 4, 543.45 2,639,744.45
J. I. Case Company_ 8, 794.78 5,109,767.18
15. On December 5, 1950, an inspection of the Cramp Shipyard was made by Mr. E. Trimble of the Rock Island Arsenal, accompanied by Mr. W. A. Mortensen of the Philadelphia Ordnance District. Mr. Cates was in attendance. Cates advised that plaintiff had an option on all or any buildings, yards and docks, which were considered by them necessary for the rebuild program, and further, that any of the machine tools and related equipment in any of the buildings were available for use by the plaintiff in performing the work. Both Trimble and Mortensen reported to their superiors that the facility at Cramp Shipyard at Philadelphia was suitable for the performance of the work of rebuilding the tanks. (The word “tank” is a popular name for motor gun carriage.)
16. The notice of award was dated December 28, 1950. By such notice, the plaintiff was directed to proceed with the work “in order that the delivery schedule outlined in your proposal may be strictly maintained.”
17. By the end of December 1950 or the first days of January 1951, Cates and Coleman arrived at Philadelphia. They set up offices at the Drake Hotel. Mr. Danuser, who had worked with them in Hawaii, soon joined the operation. These were the only employees of plaintiff, apart from its New York office employees, in its employ during the performance of the work on the contract in suit who had been previously employed by that firm. It was thus necessary to hire almost an entire organization of administrative as well as production employees. This was begun.
*576 18. The plaintiff exercised an option it bad obtained on facilities at the Cramp Shipyard in Philadelphia. The yard was owned by the United States under the direction of the Navy but had been leased in its entirety to a private firm known as the American and Foreign Warehouse Co., Inc. Under the sublease 70,000 square feet of production space in building 11-1 was to be made available to the plaintiff. Another building for the storage of parts was to be provided also. In addition, outside areas were to be made available for the storage of tanks. During the period which has been described by the parties as the “first phase” of the work, the plaintiff had continual difficulties with its landlord. Clearing of work space in building 11-1 was begun early in January 1951 but proceeded slowly. This clearing of such space was necessary because that building was full of bags of grain and stores such as cartons of canned soup. There were, in addition, many large items constituting a disassembled steel mill.
19. Before the award of the contract, Col. W. W. Warner, the commanding officer of the Bock Island Arsenal, Bock Island, Illinois, invited the representatives of the firms which had submitted bids to a conference at the Arsenal on November 24, 1950. Mr. Cates appeared at the conference on behalf of the plaintiff. Since action had already begun in Korea, all present were aware that the defendant was at that time engaged in military action there. Warner told those present that spare parts from Government stores would be made available to the successful bidder as promptly and as efficiently as possible within the abilities of the Army but that parts were not plentiful due to the war situation causing heavy requisitions on the parts stores. Warner also stated that guns (which were to be separately furnished) would be delivered substantially as follows: 50 in March, 75 in April, and 100 per month thereafter and that that schedule had been based upon information he had received from the facility then engaged in overhauling the guns.
Drawings were also discussed and Warner told those present that the successful bidder would be furnished the drawings necessary to the procurement of parts from commercial *577 sources which were not standard hardware items, and, therefore, peculiar to the M36 tank.
20. At a conference at Rock Island Arsenal on December 18 and 14, 1950, plaintiff was informed that it had been awarded the contract. Mr. Cates, representing the plaintiff, was again advised by Colonel Warner of the scarcity of parts in Government stores due to the needs of the troops in combat. The details of the proposed contract were discussed and agreed upon. In particular it was agreed that the M36 vehicles to be rebuilt by plaintiff would be delivered without guns, and that the guns would be reconditioned at Rock Island Arsenal and delivered to the contractor as rapidly as possible. It was also agreed that plaintiff would be supplied with a pool or “float” of 200 reconditioned engines by Rock Island Arsenal so that completion of the first vehicles would not be delayed while plaintiff rebuilt the engines originally in the vehicles or contemplated by the pre-award negotiations. The Rock Island Arsenal Overhaul Guide and Specifications for the Rebuild of the M36 Motor Gun Carriage was provided the contractor on the second day of the meeting. The general scope of the Rebuild Guide had been given all of the bidders prior to their submission of bids. At the conference on December 13 and 14,1950, plaintiff was informed that a few of the detail specifications were yet to be worked out with the Ordnance Tank Automotive Center (OTAC) in Detroit, Michigan, and that they would be sent to the Philadelphia Ordnance District for incorporation in the definitive contract. Plaintiff agreed to go forward pending formal incorporation of the specifications in the contract. It was also agreed that because of the scarcity of the parts supply in Government stores plaintiff would not order parts in maximum quantities. In order to expedite the procurement of parts and avoid unnecessary requisitioning by the plaintiff, Mr. Hugh B. LaRue, the chief of the Tank Automotive Branch of the Philadelphia Ordnance District, who attended the conference as one of the representatives of the Philadelphia Ordnance District, offered to supply plaintiff with a copy of a mortality table of parts compiled by Bowen and McLaughlin and reflecting their experience in the parts that it was necessary to replace in the *578 rebuild of substantially similar vehicles. It was agreed that Mr. Cates would come to the office of the Philadelphia Ordnance District on December 18, 1950, to set up procedures for obtaining parts and vehicles from the Army. At that time it was agreed that the Bowen and McLaughlin mortality table would be given the contractor to use as a basis for the initial requisitioning of parts. Moreover, the Philadelphia Ordnance District agreed that it would have the initial requisitions hand-carried to the Rock Island Arsenal so that immediate action might be taken to supply the paints or to report that they were not available in Government stores. Finally, Mr. Cates indicated that plaintiff would he prepared to receive vehicles from the Army for rebuild on approximately January 15 or 20, 1951, and would expect to begin making deliveries in March or April 1951. At the conference action was taken to initiate shipment of vehicles in the following quantities from the ordnance depots designated:
471 from Letterkenny Ordnance Depot
6 from Lima Ordnance Depot
71 from Anniston Ordnance Depot
33 from Rock Island Ordnance Depot
21. On December 18, 1950, Col. W. W. Warner, commanding officer of the Rock Island Arsenal, requested the chief of Ordnance of the Army to direct the Detroit Arsenal to furnish both the Philadelphia District Office and the plaintiff a complete set of reproducible prints for the M36 tank with the statement: “This is considered necessary to permit the above firm to effect immediate manufacture or procurement of the parts not available through normal supply channels.”
On January 8, 1951, in a conference between a representative of the Detroit Arsenal and Mr. LaRue of the Philadelphia Ordnance District, it was determined that it would be too difficult to supply all 15,000 to 20,000 drawings pertaining to the M36 tank. Instead, a list of drawings was furnished from which plaintiff was to choose only the drawings absolutely necessary for procurement. Mr. Coleman, plaintiff’s project manager agreed to limit requests for draw *579 ings to those essential in procurement of parts which were unavailable in Army stores.
22. The work of requisitioning parts from the Army was begun while plaintiff waited to get possession of the facilities at Cramp Shipyard. During the first week of January 1951, Mr. Nathan Cohen, an experienced property and supply clerk, was assigned by the Army to assist in expediting the initial requisitions prepared by Mr. Cates, Mr. Coleman and Mr. Lively for plaintiff from the Army Supply Catalogue SNL G-210. It was Mr. Cohen’s duty, as defendant’s property and supply officer, to help plaintiff put the appropriate information in the proper place on the Government requisition forms. Then the finished forms were carried by hand to the Philadelphia Ordnance District where they were signed by a Major Felch and returned immediately by hand to Mr. Cates at the Drake Hotel. The requisitions were then mailed or carried by Mr. Cates to the Nock Island Arsenal for action. The first nine requisitions were processed in this fashion. After the first nine requisitions had been carried to the Philadelphia Ordnance District by Mr. Cohen, signed and returned to Mr. Cates, Mr. Cohen was authorized to sign the requisitions at the contractor’s office, eliminating the necessity of carrying them to the Philadelphia Ordnance District. Mr. Cohen signed approximately 11 more requisitions before the contractor moved its requisitioning activity to the shipyard.
23. The plaintiff, according to Mr. Cates, in the early stages of the work wanted to order a complete set of each part necessary to assemble the full total of 581 vehicles. This would have converted the plaintiff’s operation to an assembly operation instead of a rebuild operation. This was discussed by Cates with representatives of the defendant, who refused to accede to Mr. Cates’ wishes in this regard.
24. While plaintiff had been given a copy of the Bowen and McLaughlin mortality table by Mr. Laltue, it does not appear that plaintiff’s representatives used this aid in preparing their initial requisitions, but relied instead on the Supply Catalogue SNL G-210. The first requisitions were ordered on the basis of 60 vehicles.
*580 25.Tbe plaintiff slowly cleared building 11-1 of tbe bags of grain. From January 1 to July 25,1951, by periods, tbe usable space in that building which was available for use by the plaintiff was as follows:

Square feet

Jan. 1 to Jan. 30_16, 500
Jan. 31 to Mai-. 3_ 28,282
Mar. 4 to Mar. 9_31, 388
Mar. 10 to Apr. 13_ 36, 288
Apr. 14 to Apr. 28_41, 969
Apr. 29 to May 24_ 43, 934
May 25 to July 25_ 59,008
26. As parts began to arrive at the plaintiff’s plant from defendant’s stores, they were delivered into and stored within building 11-1 initially. During January 1951, parts were received and stored in boxes covering an area of 20 feet by 100 feet with boxes piled about 15 feet high. In the early part of February, permanent storage in various areas in other buildings was obtained and the movement of this pile of boxed parts to such other buildings was begun.
By March 1,1951, a large influx of parts had been received with as many as 10 freight carloads and 10 full truck trailers being received in a single day.
On May 3, 1951, the plaintiff had been given advice that eight carloads of spare parts were en route to the plaintiff’s plant.
27. By February 15, 1951, the rebuild specifications were complete and in the hands of the plaintiff. Mr. Oates, in reporting to each of the joint venturers on March 13, 1951, stated in part: * * Mr. Coleman and I both agree that the Bock Island Arsenal Overhaul Guide and Specification is spelled out to the extent that the contractor knows exactly what he is supposed to do. * * *”
28. The Government provided plaintiff with special tools and equipment to assist it in the rebuild proj eot. In addition, extensive and continuous efforts were made by Government representatives to assist plaintiff in expediting procurement of parts from Government stores or in rapidly approving plaintiff’s requests to purchase parts from commercial sources or for deviations.
29. From the outset plaintiff’s rebuild operation was characterized by lack of coordination and planning, which *581 continued throughout the first phase of the work until the early months of 1952.
30. In the critical beginning months of the contract and continuing through the first phase of the rebuild work, plaintiff’s personnel, and particularly its field manager, Mr. Cates, were engaged in performing or attempting to secure work outside the M36 rebuild.
31. Plaintiff met with constant lack of cooperation and active interference from its landlord, American and Foreign Warehouse Co., Inc., which delayed production and disrupted orderly procedure by arbitrary cutting off of utilities needed for production and failing to provide plaintiff with the space it had leased for storage and production, and failing to make tools and equipment available for plaintiff’s use in accordance with the lease agreement. The failure to receive all of the storage space, which plaintiff had apparently expected to occupy under its lease, adversely affected the formation of an efficient production line and prevented the proper and orderly storing of Government-furnished and commercially obtained parts. The lack of adequate storage space, particularly in the early days of the contract, increased the difficulties plaintiff was experiencing in establishing a workable stock control system. A stock control system was essential in an operation of this type so that plaintiff would know the parts it had on hand and where to find them as they were needed, and so that it could anticipate its future need for parts. Checks made by Army property control representatives established that plaintiff’s system was deficient in both respects during the first phase.
32. By March 23, 1951, 212 tanks had been received at the plaintiff’s plant for rebuild under the contract. The total payroll consisted of about 125 employees at its plant facility with 57 in the production department. Sixty-five additional tanks had been received for rebuild by the middle of J uly.
33. The parts issue room in building 6-2 was opened on March 20, 1951. On that date, however, much of the space had not been cleared for plaintiff’s use. Its urgent need for additional space in this building to accommodate the great quantities of parts then arriving was called to Mr. Cates’ attention by Mr. Coleman.
*582 34. In the latter two weeks of March 1951, the plaintiff sent a representative to Detroit to expedite delivery of drawings. He was told by Army representatives there that about 90 percent of the drawings which the plaintiff had requested were classified documents, that reclassification would be necessary, and that it wotdd require from 1 to 3 weeks to accomplish this. The delay in receipt of such drawings was called to the attention of the contracting officer at the Philadelphia Ordnance District in writing on April 2d.
35. As early as April 3, 1951, it became apparent to the plaintiff that the estimate of $500,000 as the cost of its commercial procurement of parts which the Army could not supply was inadequate. On that date, it estimated that an additional $1,000,000 would be necessary and it asked the contracting officer for a contract amendment for the increase which was later allowed.
36. The first “request for permission to purchase” was apparently sent to the defendant on April 9,1951. Such requests were made after the plaintiff was notified that a part was not available from Government sources. It was about a week after the date referred to above when the first order for wiring harnesses was placed by the plaintiff. This became a troublesome item of plaintiff’s commercial procurement. It is not pointed out in the evidence the date on which the plaintiff was told of the non-availability from Government sources of these items.
37. By May 1, 1951, the officers of each coventurer concluded that Mr. Cates needed the assistance of a person of high caliber with previous tank experience, who also had “excellent contacts with the Tank Automotive Center in Detroit and with the Ordnance Department in Washington.” Such a man was then hired at a salary of $2,500 per month plus $300 per month expense allowance. He was hired as a consulting engineer. After about 3 months, however, the employment of this individual was terminated.
38. The first tank rebuilt under the contract went to the test track on May 25, 1951. At that time, three additional tanks were being rebuilt to the point that it was then expected that they would be ready for their test runs in the early part of the ensuing week.
*583 39. On May 4, May 28, and again on July 24, 1951, the plaintiff wrote to the contracting officer advising that drawings bad not been received though requested earlier. Three hundred and twenty-eight drawings were listed by number as not received in the May 4th letter, and 163 similarly listed in the May 28th letter, and 76 so listed in the July 24th letter. The contracting officer was advised that without detailed drawings, manufacture of parts denied by Government depots could not be accomplished. However, no advice was given as to which of the listed drawings related to any specific part which had 'been denied by the Government.
40. Shortly prior to June 20, 1951, Mr. Cates apparently called upon all department heads at the plaintiff’s plant to comment upon reasons for lack of production, as well as an up-to-date estimate of production costs. On June 20, 1951, Mr. Lively, the production superintendent, directed a memorandum to Mr. Cates in the following terms:
The following is a summary of the estimated production costs:
Paint_$22, 800
Sand_ 11,400
Cleaning Compound_ 9,360
Rigging Equipment & Tools_ 1, 000
Special Protective Oil_ 660
Gasoline _ 12,650
Oil _ 12,255
Grease_ 2, 320
Hauling_ 14,375
Hand and Air Tools_ 7, 500
Labor (no overhead)_ 754,400
Miscellaneous Supplies_ 7, 000
Total estimated production costs_ 855,720
Along with the complete costs, you requested we submit all complaints and hold-ups on the line, which is as follows:
We are in need of approximately 125 men on the production line. We still need air tools, a 200 ton hydraulic press, and a couple lathes, welding machines, and one (1) more overhead crane.
I have no excuse for “no production”, and I submit no complaints about the other Department Heads, as you will probably receive plenty in the reports turned in from other people.
*584 41. In the early production stages of the contract, sand blasting of the tank and its components was used in the cleaning process to remove old paint, dirt and mud. It was concluded that a better method would be to substitute the use of shot blasting for the sand blasting. Toward this end, shot blasting equipment had been ordered and was ready for operation shortly after July 9, 1951. Parts which, because of their machined surface, could not be cleaned with either sand or shot blasting, continued to be cleaned in tanks containing an oakite solution.
42. Lt. Col. H. P. Klair became chief of the Industrial Division of the Philadelphia Ordnance District shortly before the end of July 1951. On July 81, 1951, Mr. Cates prepared a memorandum which he called an agenda for informal discussion with that officer on that day. The conference was held as scheduled and Cates furnished a copy to Klair either before or at the conference. It is a fair inference that all of the major causes of difficulty which the plaintiff was experiencing in the performance under the contract, which Cates believed the Army could assist in solving, were covered therein. The memorandum reads as follows:
An agenda for an informal discussion on Tuesday, July 31, at your office, Philadelphia Ordnance District, is listed below. This list comprises variable factors which necessitate a delay in an adequate production of rebuilt motor gun carriages on our contract.
(1) Subject vehicle is an obsolete tank. Component parts are not in stock.
(2) Bill of Material has never been furnished the contractor for his mortality rate in ordering parts. A bill of material has now been established after disassem-bly of 50 vehicles.
(3) .At inception of project, the contractor was allowed only 90 days procurement from Government stocks.
(4) Parts were ordered from SNL-G210-ORD 8 and 9 and the Engineering Write-up. This was approximately 6,000 different parts. Of these 6,000 parts, approximately 2,500 had been denied the contractor.
(5) Present requisitioning denotes 85% denial on all Government Free Issue parts.
(6) Army procedures are delaying urgently needed requirements. It is necessary to place a requisition on *585 Detroit who, in turn, has to annotate the copies, extract the copies to the supplying depots, and inform the contractor of denials. This normally takes on an average of about 30 days before all information is in. After denial is received by the contractor, it is necessary to procure three or more bids for the part required. After bids are received, requests for permission to purchase have to be submitted to the Army for approval to purchase. After all these procedures are followed and the parts are delivered, another 30 days has elapsed.
(7) The contractor asked previously for a sum of money to be assigned for urgently needed items so necessary to keep our production flow. On individual part procurement, this fund can be controlled by the Army and the contractor and would keep the production line flowing.
(8) Subcontractors are a problem at this time. No recourse can be taken against them for default. 20% of the subcontractors are late in delivery, and 5% are in default over their contract. 800 purchase orders have been placed by Commerce International for subcontracting. Approximately 100 have not been fully processed as of this time.
(9) The contractor has had to order approximately 500 parts which were not in the SNL or in the Engineering Write-up. This has delayed the procurement of parts. This was necessary because of no bill of material.
(10) Hardware items are difficult to procure as they are not standard hardware which could be purchased from commercial sources. They have to be manufactured to Government specifications. Subcontractors are having a difficult time getting material. For example, connectors and terminals we can buy locally which will suffice for the job. They will not be passed for Government inspection in accordance with specifications.
(11) The contractor has received material from Government stocks which have either had wrong nomenclature, wrong sizes, or wrong material in the cases upon opening. This has delayed production, and the contractor has taken steps to correct this by opening each and every individual case in its facility. Upon determining wrong parts, the material has to be then re-ordered.
(12) Certain examples which have given the contractor trouble at this time are:
(a) Auxiliary generators. This is obsolete, and parts cannot be procured because drawings are no longer available and the original manufacturer has *586 neither the parts nor the tools and dies. Another generator could be assigned to this job which would fit another tank, and all the contractor would have to do would be just to change the mount for installation.
(b) The head lamps are a considerable problem at this time. This is also obsolete.
(c) Sylphon valves. The contractor has not been able to procure new valves in accordance with specifications for this vehicle.
(d) Azimuth indicator. The Rebuild Guide states that the azimuth indicator has to be rebuilt for this contract. No parts, nor drawings, are available for this rebuild.
(e) The Rebuild Guide states that tow hooks are to be applied to the vehicle. The contractor has been unsuccessful in obtaining tow hooks.
(13) The contractor is still short of drawings. As of this date, there are about 72 drawings which have not been supplied in accordance with our contract. Without the drawings, subcontracting cannot be effected.
43. One of the few exhibits in the record of this case which relates the shortage of parts to the need in the production line of the particular part is a report made to Mr. H. S. Coleman on July 9,1951, by Mr. J. Price, who was engaged in production control time studies for the plaintiff. It came to Cates’ attention and was called an “excellent report” by him. The report reads as follows:
July 9, 1951.
To: H. S. Coleman
From: J. Price
Subject: Inventory — Completed Parts and Assemblies Please be advised of the following:
Priming Lines, Bear. — We have two in stock for installation.
Priming Lines, Front.- — -None in stock. These are being made up as needed for installation.
Towing Shackles. — None in stock.
Floor Plate Supports — None in stock. Plenty located in Platen Area to be cleaned, but same are not being cleaned.
Dia. Oil Drain Plugs. — None in stock. Tanks coming in minus these. When tanks leave for Test Area, holes are sealed with hyd. masking tape.
*587 Fenders. — None in stock. Five sets drawn from Stores Eequisition on Purchase Order.
Fuel Filters. — Being drawn as needed from Stores Eequisition.
Electrical Conduits. — Plenty in stock to be cleaned, but no one cleaning them.
Exhaust Flanges. — Completely out of stock in installation dept.; dis-assembly department has 20 sets to be re-worked, laying in pile m Platen Area.
Hubs and Sprockets. — Completely out of stock in Installation Dept. Eemoving power trains in Dis-assembly Dept, and placing on floor and not removing hubs & sprockets. There are 41 power trains in dis-assembly dept, with hubs & sprockets attached.
Engine Hatch Doors. — Completely out of stock for installation. There are 12 sets (24 doors) in dis-assembly dept, have not been worked on for assembly.
Dis-Assembly. — Would suggest a general house-cleaning in regards to storage of parts taken from tanks.
Finished Parts db Assemblies. — Suggest house-cleaning in regards to storage of completed parts, as we have found same to be in 2 & 3 different sections of shop. This condition is very bad at present, and until such time as it is cleaned up, we will not be in a good position to tell what we have & what we don’t have in stock.
Water Pumps. — Assembly men in Engine Installation are using too much leverage and breaking off small ear.
Escape Hatch Caskets. — These gaskets are coming in wrinkled, which makes it difficult to handle in installation, and necessitates clamping same to hatch after applying Permatex.
44. Although the plaintiff’s bid had included the engine rebuild (see finding 13), the contract as finally negotiated required the Government to furnish the engines in such an operable condition as to be installed without further cleaning, rebuilding or repair. (The contract price had been negotiated downward from the plaintiff’s bid price.)
Early in the period of performance, 581 Ford GAA engines were furnished to the plaintiff. The plaintiff was to remove any engines in the tanks for return to the defendant and rebuild the tanks with those which had been furnished to it. Because of the extreme shortage of engines for the de *588 fendant’s field service and overseas requirements, it became necessary to bave 313 of the 581 Government-furnished engines returned to Government installations and this was accomplished in June 1951.
45. The confusion and inefficiency which characterized the first phase of plaintiff’s operation was in large measure compounded by and due to inadequate, inexperienced personnel, particularly at the foreman, supervisory and executive level. The authority of supervisors and the area of their jurisdiction were not clearly defined. Conflicting orders were given to the production force with resulting confusion on the production line. Bitterness was evident among executive and supervisory personnel as well. The executive organization was inadequate to the needs of the project and the constant shifting of authority and turnover of department heads impaired production and plant morale in general. Moreover, the quality of production workers was inadequate to the needs of the operation. Little control was maintained of the work force who came and went as they pleased. Personnel records were kept on a haphazard basis. Some difficulty with labor unions was experienced. Strikes against other tenants of the Cramp Shipyard interfered with plaintiff’s efforts to get tanks to its test track or to receive trucks from outside since the tanks and trucks were not permitted to cross picket lines.
46. There was much turnover of plaintiff’s personnel at the supervisory level from which it can be inferred that those charged with the ultimate responsibility to plaintiff’s officers to perform the work of the contract were not satisfied with the performance of those who were replaced. In several instances, executive-type personnel resigned because they were not satisfied with operations as conducted at the plaintiff’s plant.
47. The personnel which the plaintiff had assigned as expediters were successful in obtaining many of the drawings requested of the defendant. On March 19,1951, 3,426 drawings were requested. Between April 2 and May 9, 1951, 3,376 drawings were received, some of which had not been requested. Although the plaintiff has demonstrated that it *589 requested drawings of the defendant, there is no satisfactory evidence that the failure to furnish any particular drawing had any effect upon the performance of the contract work. The evidence is clear that the drawings were needed in the case where the plaintiff had to order a special part manufactured by a subcontractor. In no instance has the plaintiff shown that the ordering of any part was delayed due to lack of a drawing.
48. There is in evidence a schedule of tanks at the test track which furnishes as good an index of the progress of the plaintiff’s work as any evidence in the record. This information is a take-off from plaintiff’s correspondence folders and may be summarized by months from May 1951 through September 1952. The totals include two tanks which were returned to the test track more than one time, and are shown below:

Number of Year Month tanks

1951_May_ 6
June - 5
July - 14
August - 15
September -- 11
October _ 46
November _ 44
December_ 106
1952_January _ 16
February _ 0
March_ 0
April_ 13
May- 43
June _ 69
July_ 90
August _ 82
September _ 43
49. Much of the plaintiff’s evidence is bottomed on two exhibits which were admitted in evidence on the testimony of Mr. Cates as records which he says he maintained daily in the regular course of business and which he, as general manager, was required to maintain. The one is referred to in the evidence as the master production schedule, plaintiff’s exhibit No. 125, and an 18-page production record on graph *590 paper on wbieh. red crayon marks were made to indicate the course of production, plaintiff’s exhibit No. 126. Careful examination of these two documents shows that they were not prepared from day to day and that they are not entitled to probative value.
50. In order to keep the tanks moving along the line, it often became necessary to strip a part or an assembly from a tank to be rebuilt and install such part or assembly on a tank on the line in order to move along with production where a part was not in stock. This process was referred to in the testimony as “cannibalizing.”
51. The contract provided that plaintiff would be supplied by defendant with reconditioned 90 mm. guns ready to be installed on the vehicles to the extent they were available from defendant’s existing stores.
52. The plaintiff, early in February 1951, was notified by a copy of a letter from the Eock Island Arsenal to the commanding officer, Erie Ordnance Depot, LaCarne, Ohio, that 581 guns would be furnished to that depot in the near future to be proof-tested by firing the guns there and upon completion of such tests, the depot was instructed to ship 408 to the plaintiff, and following shipment of 104 similar guns elsewhere, it was to ship the balance, which plaintiff then required, of 113 guns.
53. In the December contract negotiations, it was understood that the tanks would be delivered without guns and that the Eock Island Arsenal would recondition them and deliver them to the plaintiff as fast as possible.
54. As early as June 1951, the office of chief of Ordnance advised the Philadelphia Ordnance District of the critical supply of 90 mm. guns and that it might be necessary to accept the vehicles rebuilt less guns. This information was communicated to the plaintiff.
By August 13, 1951, the plaintiff had received only 94 guns. It wrote to the Philadelphia Ordnance District to inquire as to when it might expect the balance of the guns.
The answer to this letter, if one was received, is not in evidence. However, in early September the plaintiff communicated to the defendant’s resident inspector at the plain *591 tiff’s plant as to the rebuild of tanks without guns. The inspector relayed the inquiry to the Philadelphia Ordnance District.
55. On September 25,1951, the deputy district chief of the Philadelphia Ordnance District wrote the following letter to plaintiff:
Information has come to the attention of this office that there is presently a shortage of guns, 90MM, MS series. This is to advise that the rebuild operations, under subject contract will not be stopped with the exhaustion of gun supply, but on the other hand, you are-requested to rebuild the vehicles within availability of guns and in the instances in which guns are unavailable, the incompleted rebuilt vehicles are to be stored by you until guns become available. In the event guns do> not become available within a reasonable period of time,, instructions will be issued for shipment of the rebuilt, vehicles without guns.
Within the very near future you will be contacted by the appropriate division of this District for the purpose of negotiating a change to subject contract to reflect the instructions herein given and to provide for an equitable adjustment in the contract price in the event it becomes necessary to ship the rebuilt vehicles less guns.
56. The shortage of guns was caused by the fact that all available 90 mm. guns had been shipped to Korea by the-defendant.
57. The performance of the contract work as it was. affected by the failure of the defendant to send guns to the plaintiff was the subject of contract amendments as to which the plaintiff agreed and for which it was paid an increase-in the contract price. Plaintiff has failed to show what additional costs, if any, it incurred by the delay in delivery of' guns during the first phase.
58. On October 5, 1951, the plaintiff wrote the following-letter to the Philadelphia Ordnance District:
Confirming our recent conference, enclosed is listing-of parts with requisition dates ranging from March 1, 1951 to July 17, 1951 for which delivery has been promised from ordnance stocks but has not yet been, accomplished.
*592 The above mentioned listing is only an example _ of failures beyond the control of this contractor which are delaying production and increasing costs. More detailed listings are being prepared for submission to your office.
With further reference to our conference,. enclosed is listing of drawings which have been previously requested from your office but, not yet received. Reproducible prints, of the latest revision, at the earliest practicable date, will be appreciated and preclude possible further delays.
(The listing of drawings referred to in the last paragraph of the above-quoted letter is not in evidence.)
59. On September 13, 1951, the president of Hyman-Michaels Company, one of the plaintiff’s joint venturers (see findings 5, 6, and 7) wrote to the president of the plaintiff company, in part, as follows:
We are pleased to note your itemization of what amounts to the government’s default and your anticipation of obtaining adjustments to cover. We only can hope that these adjustments will fully compensate for the losses these defects have caused us to suffer. All_of the above only emphasize, in our minds, the necessity for the utmost efficiency in management, particularly top level management. None of the remarks contained in our letter of September 6, or in any of our many conversations and discussions on this point are meant to be criticisms of any members of the staff. We would be the last one to create dissatisfaction or encourage friction within the personnel, nor do we believe that the organization is bad, nor that the job is being mishandled but, at the same time, we are of the opinion which we have expressed to you and to certain of the top level men at Philadelphia, and have manifest by our actions in encouraging Dimitri, that we feel the organization is not perfect or incapable of improvement. We think that a careful analysis of the remarks contained in your letter as well as on some things in which your letter is silent, that we are more or less in agreement on this point.
With reference to Cates, we quite agree with your comments and believe he is handling his work extremely well but it is our understanding he is not what one would call the production manager. We understood that that was Coleman’s job. With reference to Coleman, I have *593 expressed to yon my opinion, of him and my high regard of his capabilities, and certainly of his character but your own letter points out certain of his deficiencies which are principally due to complete lack of experience on any similar type of job.
We have no particular comment to make at all with reference to any of the other men whose background you refer to with the exception of Mr. Hicks. We are still not quite clear as to the responsibilities to be assigned to Mr. Hicks. Your letter states he is to be assistant to Cates. If that is the case, not knowing Mr. Hicks, we would certainly not be in a position to at all criticize and he probably is very well qualified for this purpose. If his responsibilities are to assume stock control, he is undoubtedly qualified but if it is intended that he be the top production man then we wish to withhold our approval until further evidence of his experience and capabilities are presented.
I understood you to say on the telephone that you felt that by centralizing the operation into approximately four general categories, each with a department boss, that an overall top production manager was unnecessary as the job was now going satisfactorily and handsomely and the present organization was functioning well. If I understood you correctly, I can only say that we disagree with this policy as we think a job of this magnitude involving direct expenses of $80,000.00 per week, plus many other items including rent, requires not only a top level production manager but an extremely capable one, where a delay of any kind whatsoever can be so expensive one can hardly estimate the value of preventing such delays.
At this time we do not wish to comment further on the accounting except to say we feel it has been extremely remiss in its failure to have furnished the partners with statements. We are glad to note that Mr. Fisher is drawing up August statements which we hope will soon be available.
To repeat our summary, we feel that your letter does not change in any way our conclusion but in fact emphasizes the necessity for having top flight general production manager. This is the only issue that we are concerned with in this correspondence.
60. By October 11, 1951, the plaintiff had written to the Philadelphia Ordnance District advising that whereas it had been supplied 581 engines originally, 313 were returned to the *594 Government in June 1951, and that of the difference, only 84 were on hand of which 5 were not operable. It requested urgent action to secure delivery of engines in sufficient time to preclude production delays and resultant added costs.
A reply to the above-described letter, dated October 31, 1951, stated that arrangements had been made to supply 24 engines with additional deliveries being planned.
61. By November 5, 1951, the plaintiff had received 395 tanks for rebuild and of that number, 45 had been rebuilt and shipped.
62. Whether the 24 engines referred to in finding 60 were sent to or received by the plaintiff is not shown. In any event, the lack of engines rendered it necessary to suspend operations at the plaintiff’s plant.
63. On December 11,1951, the deputy district chief, Philadelphia Ordnance District, sent the following letter to the plaintiff:
As a result of an independent investigation undertaken by this District, it has been determined that Guns, 90mm, M3 series and engines which are required to be furnished to you under the terms of subject contract are in short supply and not available at this time for issuance. For that reason you are herein authorized and directed to suspend rebuild operations following the completion of the 270th vehicle until further notice is given by the Contracting Officer to resume operations under said contract. During this period of suspension you are directed to continue to purchase all parts for vehicles authorized to be procured in order that all required parts, other than the items to be furnished by the Government, will be on hand to permit orderly resumption of operations on an economical basis.
Except for reimbursement for expenditures chargeable to Part II of subject contract, nothing contained herein shall be construed as obligating the Government to pay or reimburse your Company for any added costs or expenditures resulting directly or indirectly from the suspension herein authorized and directed.
The suspension letter quoted above was, on February 1, 1952, amended to change the 270 figure in the letter to 261.
64. There is a dispute in the evidence as to the time during which work was suspended pursuant to the above direction. *595 The plaintiff claims that the disassembly of tanks stopped in the early part of November and did not resume until the second week in April 1952, whereas the defendant urges that the 261st tank had completed final test on February 15th. It is found that the work under the contract was suspended for the convenience of the defendant from December 15, 1951, until March 15,1952.
65. Mr. A. C. Breitenbeck, who had had extensive production experience during World War II in the manufacture of tanks similar to those involved in this contract, was hired by the joint venturers as manager of operations, beginning on March 1,1952, subject only to the orders of the partners or officers of the constituent firms of the joint venturers, and placed in direct charge of the performance of the completion of the 340 tanks, at a salary of $20,000 for the 1-year period ending February 28, 1953, with a bonus of $10,000 if all of the remaining 340 tanks were finished and accepted by the defendant prior to August 31, 1952, such date subject to extension due to strikes, lockouts, breakdowns and the like.
Breitenbeck began work at the plaintiff’s plant on March 1, 1952.
66. In January or February 1952, the plaintiff’s landlord went into bankruptcy. This eliminated what had been an extremely troublesome factor from the plaintiff’s subsequent operations as the plaintiff then became a tenant directly dealing with the U.S. Navy Department as landlord. Under this operation, the plaintiff was not delayed as it had been earlier in the use of cranes, the cutting off of utilities, and the general interference with the work by a temperamental, obstreperous and annoying landlord.
67. Plaintiff resumed its operations on March 15, 1952.
68. After March 15, 1952, with Breitenbeck’s direction to the work, and with the previous experience of those of the plaintiff’s employees who were then employed by it, the work moved along reasonably well until completion. The plaintiff was not delayed on account of guns or engines or parts. The work was essentially completed by the end of September 1952.
*596 69. In about 5,400 pages of transcript of testimony, and exhibits which fill a four-drawer legal-size file case, there is a dearth of evidence which would demonstrate that the shortage of parts which had been requested of the defendant and were not promptly sent to the plaintiff’s plant, interfered with the production of rebuilt tanks by the plaintiff during the first phase. The defendant, as to many parts, told the plaintiff to buy or manufacture parts which were not available in Government stores. There were delays encountered by the plaintiff in acquiring such parts from subcontractors. There were other delays caused to the work as to which the defendant was in no way responsible. The extent of delays to the work on account of shortages of Government-furnished parts is not reflected in this record.
At the end of the work, eight carloads of parts, which had been furnished to the plaintiff by the defendant and not used on the rebuild, were returned.
Satisfactory proof is not shown that the purchase of parts by the plaintiff was adversely affected by the failure to have drawings available.
70. During the suspension period, Cates sent a memorandum to Mr. Ullom, who was in charge of the commercial procurement of parts and material for the plaintiff, which was very critical of the delinquent purchase orders as of February 18,1952.
On February 21, 1952, Ullom replied in a memo to Cates as follows:
Subject: Delinquent Purchase Orders
I am in receipt of your memorandum of February 18 relative to the subject delinquent purchase orders. I have read this memo numerous times and have analyzed it thoroughly. To answer your questions on the thirteen items as dissected by you would require reams of paper. There is a long story behind each and every item, in which you are not interested. IPowever, be assured that full attention is being given to the delinquent purchase order list and the necessary results have been and will be more apparent between now and the end of March.
There is one tremendous handicap that this office is working under. I have mentioned it many times to you, Mr. Fisher, and Mr. Fassoulis. You are aware of this *597 handicap, which is the delayed manner of payment of invoices to the vendors we are dealing with. With the exception of Mr. Fisher, my pleas have been very lightly received and in some cases I was told to get additional sources. This is not a very business-like way to handle the situation. I am at the head of this department and have operated it to the best of my ability. Whatever the orders are that I receive, I try to carry out. I have been loyal to the company and have given these vendors a lot of stories to offset our delinquency in paying our invoices. However, it has reached the stage now in such proportions, that these vendors are beginning to balk about the continuous pressure to expedite these outstanding purchase orders. In most cases the companies involved are small and are operated with a very limited amount of capital. It is a necessity with these companies to turn over their capital very quickly. They have reached a point now where they are most desirous of doing business with other firms where they can turn over their money more quickly. The good will that has been established between this office and these vendors is gradually dissolving because of this financial situation. Everyone in this office has done their utmost to bring about expeditious action on these orders. No one has complained, including the writer, about this situation; but for the future good will that this company can create with our vendors, I cannot express the deep concern which should be given to the matter. It would improve our position considerably if this could be straightened out and we could give assurance to the vendors that the future invoices will be promptly paid.
71. The plaintiff was delayed in the performance of the work by the failure of the defendant to make engines and guns available during the period December 15, 1951, until March 15, 1952. It incurred certain costs because of this which it would not otherwise have been required to incur. Since some work was performed during this period for which the plaintiff was paid, some allocation of charges would be necessary. Since the plaintiff’s proof of damages was not directed towards damages arising out of the period of suspension, additional evidence will be necessary to arrive at a figure which would fairly compensate the plaintiff for these delays.
*598 CONCLUSION 02* LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover for claims pertaining to the period from December 28,1950, to December 15, 1951. The petition is dismissed to that extent. Plaintiff is entitled to recover damages arising from or attributable to the period of suspension, and judgment is entered to that effect with the case remanded to the Trial Commissioner, under Rule 47(c), for further proceedings consistent with this opinion.

 Plaintiff’s obligations under tbe contract were actually performed by a joint venture known as C.A.M. Industries, but plaintiff remained tbe only responsible contracting party. See findings 5-8. We shall therefore refer only to plaintiff. Defendant maintains that since plaintiff, as one of the joint venturers, bore only 50% of the claimed losses, it may recover no more than one-half of the total damages (if any) found to have been caused by the Government. We think that there is no such restriction. Defendant has not alleged that it is, or may be, liable to the other joint venturers nor has it sought to join them in this suit. So far as we know, there is no possibility of more than one complete recovery or of multiple suits, and since plaintiff was the sole responsible contracting party with which the Government dealt we think it entitled to full recovery should we find for it. Cf. United States v. Blair, 321 U.S. 730, 737-38 (1944). The situation here is unlike that in which a prime contractor sues on behalf of a subcontractor to which the prime is not liable. Cf. J. L. Simmons Co. v. United States, 158 Ct. Cl. 393, 304 F. 2d 886 (1962).

 This schedule was revised several times to extend the time of performance. By supplemental agreement the number of tanks was also increased. There were 12 supplemental agreements which are described in finding 3.

 A contract amendment later increased this amount substantially when it was found to be insuflicient.

 The Government made no claim for liquidated damages.

 Defendant disputes this date and says that the 261 tanks were not fully readied until a later time. The December 15th date, found by our Trial Commissioner, is well supported and we accept it.

 Plaintiff maintains that it was not told of the scarcity of parts prior to the award, but there is significant testimony in the record which supports the Commissioner’s contrary findings. The issue is one of credibility, particularly within the competence of the Commissioner who heard and observed the witnesses.

 Plaintiff points out that it was forced to cannibalize other tanks in order to find parts for the tanks on which it worked during the first phase. This resort to cannibalization proves nothing more than the admitted existence of shortages; it does not show that the shortages were caused by defendant’s fault or undue delay.

 Almost immediately after the notice of award, during the first week in January 1951, an experienced property and supply clerk was assigned by the Army to assist in expediting the initial requisitions. This employee helped plaintiff in filling out the forms which were then carried by hand to the Philadelphia Ordnance District where they were signed by an Army Major and returned immediately by hand to plaintiff’s representative. The requisitions were then mailed or carried to the Rock Island Arsenal for action. The first nine requisitions followed this procedure; then the property and supply officer was authorized to sign the papers in plaintiff’s offices without the necessity of going to the Philadelphia Ordnance District. There were also other improvements. Plaintiff says that one of the factors adding to delays was the transfer of Rock Island Arsenal’s control and supervision of the contract to the Industrial Division on April 18, 1951, and its subsequent administration by Ordnance Tank & Automotive Center (OTAC). We think, however, that the record shows that the introduction of OTAC was intended to be an improvement and there is no satisfactory proof that requisitioning took a longer time after OTAC came into the picture.

 Some eight carloads of furnished parts were returned to defendant at the completion of the worlc.

 Plaintiff’s justification for its failure to offer any specific proof that undue delays by the defendant resulted in delayed production is that, at the time of the events, it was engaged in performing its contract, not preparing for litigation by keeping a detailed tab on the defendant. But plaintiff now insists that, early in performance, it began to be damaged by the defendant’s undue delays, and it would not have been hard or unusual to keep records (at least illustrative or selective records) of missing parts which were holding up work on the tanks. Prom plaintiff’s viewpoint, it is surprising that no such records were maintained since plaintiff says that it began very early to consider the defendant at fault.

Vogt Bros. Mfg. Co. v. United States, 160 Ct. Cl. 687, 709 (1963); Marshall v. United States, 143 Ct. Cl. 51, 56, 164 F. Supp. 221, 224 (1958); Hargrave v. United States, 132 Ct. Cl. 73, 81, 130 F. Supp. 598, 602 (1955); George J. Grant Constr. Co. v. United States, 124 Ct. Cl. 202, 205-06, 109 F. Supp. 245, 246 (1953); The Tuller Constr. Co. v. United States, 118 Ct. Cl. 509, 526 (1951); Coath & Goss, Inc. v. United States, 101 Ct. Cl. 702, 714-15 (1944); Newport News Shipbuilding & Dry Dock, Co. v. United States, 79 Ct. Cl. 25, 40-42, 46 (1934); Greenfield Tap & Die Corp. v. United States, 68 Ct. Cl. 61, 76-77 (1929), cert. denied, 281 U.S. 737 (and cases cited).

Plaintiff admits its early difficulties by not seeking any damages for the period before March 15, 1951, but it does not recognize that the earlier difficulties continued to have their effects.

Production seems to have been impaired by: (1) conflicting orders to the production line ; (2) shifting of authority and turnover of department heads ; (3) inadequately skilled production workers; (4) lack of control of the work force; (5) difficulty with labor unions, as well as strikes against other tenants of Cramp Shipyard which interfered with plaintiff’s operations. Plaintiff dismisses the internal memoranda and records revealing these difficulties as “wastebasket” memoranda evoked by normal production problems which were quickly remedied. But the nature of the references in the papers to these difficulties supports the view that they were recurrent and significant problems. Plaintiff points out that the defendant did not threaten to terminate the contract for default or contemporaneously criticize the performance. These two factors deserve little weight in evaluating the Commissioner’s finding. The defendant may have felt that it would be burdensome to take the contract from plaintiff and relet it; perhaps it thought a bad bargain better than none; it may have revised its notion of the pressing need for the tanks and awaited plaintiff’s delayed performance with equanimity; and the contracting officials may even have recognized that much of plaintiff’s difficulty stemmed from the outside, such as the acts of its landlord and subcontractors or the inherent delays of obtaining government furnished items.

 “Satisfactory proof is not shown that the purchase of parts by the plaintiff was adversely affected by the failure to have drawings available.”

 Plaintiff, suing for breach of contract, has made no claim of recovery based on a mutual mistake of fact. In any event — and assuming a mutual mistake did exist — such a claim would be barred by the plaintiff’s failure to prove that its loss was due to that mutual mistake.

 Originally the 270th vehicle, but that was subsequently reduced to the smaller number.